STATE OF NORTH CAROLINA v. ROBERT LEWIS McCLAIN

No. COA04-938

(Filed 19 April 2005)

## 1. Criminal Law— competency to stand trial—mental retardation

The trial court did not abuse its discretion in a first-degree murder case by determining that defendant was competent to stand trial under the test set forth in N.C.G.S. § 15A-1001(a), because: (1) evidence that a defendant suffers from mental retar-

dation is not conclusive on the issue of competency; and (2) the evidence supported the trial court's findings that defendant was able to understand the nature and object of the proceedings against him, he comprehended his situation in regard to the trial, and defendant had the ability to assist in his defense in a rational and reasonable manner.

**2. Criminal Law— denial of motion to continue—abuse of discretion standard**

The trial court did not abuse its discretion in a first-degree murder case by denying defendant's motion to continue made immediately following the trial court's ruling that he was competent to stand trial.

**3. Homicide— first-degree murder—instructions—deliberation**

The trial court did not err in a first-degree murder case by its supplemental instructions on the element of deliberation when it used the language of *State v. Ruof*, 296 N.C. 623 (1979), because: (1) the initial instructions on deliberation were proper and comported with the pattern jury instructions on first-degree murder; (2) *State v. Ruof* is a correct statement of the law and the language contained in *Ruof*, which defines deliberation, has been cited with approval by our Supreme Court on several occasions; and (3) a review of the trial court's instructions to the jury as a whole and construing them contextually reveals that the charge as a whole was correct.

**4. Jury— peremptory challenge—*Batson* challenge—race neutral reasons**

The trial court did not err in a first-degree murder case by allowing the prosecution to peremptorily excuse an African-American prospective juror because: (1) hesitancy on death penalty questions is a race-neutral reason for excusing a juror, and the trial court was in the best position to resolve this issue since it heard and saw the responses of the prospective juror including her facial expressions, tone of voice, reactions, and other nuances that are not subject to translation when reviewing a cold record on appeal; (2) the prospective victim's brother had previously been convicted of armed robbery, and the criminal conviction of a potential juror's relative has been recognized as a race-neutral reason for the exclusion of that juror by peremptory challenge; (3) just because some of the remarks made by the stricken juror have also been made by other potential jurors the

prosecutor did not challenge does not require a finding that the reason given by the State was pretextual since a characteristic deemed to be unfavorable by one prospective juror may in a second prospective juror be outweighed by other favorable characteristics; and (4) the trial court found that at the time defendant raised the *Batson* challenge, the State had used five peremptory challenges and none of those were against African-Americans, only the defense had peremptorily excused an African-American, and one-fourth of the jury seated at the time of the challenge was African-American.

### 5. Evidence— lay opinion testimony—mental retardation

The trial court did not err in a first-degree murder case by allowing a lay witness to testify that defendant was not mentally retarded, because: (1) N.C.G.S. § 8C-1, Rule 701 permits lay witness opinion if it is rationally based on the perception of the witness and helpful to a clear understanding of her testimony or the determination of a fact in issue; (2) our Supreme Court has held that the mental condition of another is an appropriate subject for lay opinion; (3) the witness had ample opportunity to observe defendant and form an opinion as to his mental condition since she lived with defendant, saw him on a daily basis, and had the opportunity to observe him in various situations; (4) this testimony was relevant as to whether defendant had the necessary mens rea for first-degree murder and helpful to a clear understanding of a fact in issue; (5) even though the witness testified that defendant was not mentally retarded, when read in context, it demonstrates that she was not giving an expert opinion but was instead using the phrase to describe defendant's ability to function on a daily basis in shorthand form; and (6) the State was not attempting to elicit expert testimony from the witness regarding defendant's mental retardation.

### 6. Homicide— first-degree murder—short-form indictment— constitutionality

The short-form indictment used to charge defendant with first-degree murder was constitutional.

Judge WYNN concurring.

Appeal by defendant from judgment entered 25 June 1999 by Judge Ronald K. Payne in Mecklenburg County Superior Court. Heard in the Court of Appeals 15 February 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Mary D. Winstead, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.*

STEELMAN, Judge.

Defendant, Robert Lewis McClain, appeals his conviction for first-degree murder. For the reasons discussed herein, we affirm the trial court.

The evidence at trial tended to show that defendant was mildly mentally retarded. At the time of the murder, defendant worked at TPI Commissary warehouse in Charlotte, with the victim, David Evans. The two men worked as a team, as order pullers. Defendant's responsibilities included reading orders, which contained information as to the description of the item, its number, quantity, and location in the warehouse. Defendant would locate the items and load them onto an electric pallet jack for shipment. Testimony at trial indicated Evans teased defendant at work because of defendant's mental retardation.

On 15 March 1994, defendant and Evans had an argument when Evans arrived late to work. After work that day, defendant walked out with a co-worker, Michael McFadden. They walked over to defendant's car, where defendant opened the glove compartment and showed McFadden his nine millimeter pistol. As Evans was leaving work, defendant called him over to his car and said, "What was this sh— you were talking all day?" Defendant did not point his gun at Evans, but he raised it high enough that Evans could see it. After seeing the gun, Evans went to his vehicle and left.

The next day, Evans went to work and reported to his supervisor, Frederick Cantelmo, that defendant had threatened him with a gun in the parking lot. Defendant did not go to work that day because he was in jail on unrelated charges of carrying a concealed weapon and speeding. When defendant came to work Thursday morning, Cantelmo spoke with defendant about his absence the day before. After they spoke, defendant returned to work and Cantelmo contacted the company's legal department for advice.

At approximately 11:00 a.m., Cantelmo called defendant to his office. Cantelmo told defendant he had consulted with the company attorney and was firing him because he had a weapon on company

property. Defendant became angry and asked if it was Evans who reported he was carrying a gun. Cantelmo denied that Evans told him, instead stating that several employees had reported the incident. As defendant was leaving, he saw his friend McFadden and told him he had been fired for no reason, and he had a good lawyer and was going to sue.

Defendant clocked out at approximately 11:15 a.m. He contacted a lawyer in South Carolina who had represented him regarding an automobile accident. The attorney informed defendant that he would need an attorney in North Carolina. At around 11:30 a.m., defendant drove to Shoney's where Robin Lowery (Lowery), his ex-girlfriend and the mother of his child, worked. Lowery had ended their relationship several days earlier. Defendant went inside and began following Lowery around, telling her that he wanted to talk. Lowery told defendant she would talk to him later, but defendant refused to leave. In order to lure Lowery from the restaurant, defendant told her he had a package in his car for her from a woman he worked with. Lowery followed defendant outside. Defendant pointed a sawed-off shotgun at her and threatened to kill her if she did not get in the car. Lowery got into defendant's car and he drove them down a gravel road to a yellow building in an industrial area and made Lowery get out of the car. He then made her get back into the car and drove further down the gravel road to a more secluded area. Defendant again made Lowery get out of the car, ripped off her hose and panties, and forced her to have sex with him. Defendant began walking in circles saying that Evans had caused him to lose his job and that he was going to jail for the rest of his life anyway so he was going to go all the way and kill Evans. Defendant then loaded a gun and shot Lowery in her left knee. After shooting Lowery the first time, he made her take her skirt off, saying he wanted them to find her looking like a slut. Defendant began walking around her again and shot her in the right knee. Lowery tried to get away from defendant and began to crawl towards the woods. She heard a shot ring out and a bullet grazed her head. She fell to the ground and lay still until she heard defendant drive away. Lowery was later able to drag herself to a building where she received assistance. While waiting for the ambulance to arrive, Lowery called TPI to warn Evans.

At approximately 1:15 p.m. defendant went back to TPI. Defendant went into the warehouse and called out Evans' name twice. Evans and a co-worker were returning from their lunch break when they heard defendant call out. When Evans turned around,

defendant shot him in the face at close range with the sawed-off shotgun. After defendant shot Evans, he turned and pumped his fist in the air and stated, "Yeah. I got that mother f------[,]" and then drove off.

At 2:25 p.m., defendant called 911 and reported he just committed two crimes and wanted to turn himself in. He agreed to unload the weapon and leave it outside and go back into the house and wait for the police. While speaking to the 911 dispatcher, defendant asked if he would be harmed or shot when the police arrived. The police arrived and arrested defendant.

Defendant was diagnosed as being mentally retarded. Defendant consistently scored below 70 on IQ tests. The IQ range for mental retardation is generally below 70. Defendant has problems with adaptive behavior skills such as reading, using a telephone book, using a map, and filling out a job application.

In May 1999, the trial court held a competency hearing to determine whether defendant was competent to stand trial. The trial court heard testimony from the State's and defendant's expert witnesses. The trial court found defendant was competent to stand trial. Jury selection initially began on 20 April 1999. Three days later, one of defendant's attorneys informed the court he could not continue with the trial. As a result, the trial court replaced him and continued the trial until 24 May 1999, on which date jury selection resumed. Two days later, the trial court declared a mistrial due to contact between the victim's father and a prospective juror. Jury selection resumed with a new panel of jurors.

On 25 June 1999, a jury found defendant guilty of first-degree murder of Evans. In accordance with the jury's recommendation, the trial judge sentenced defendant to death.

Defendant filed a Motion for Appropriate Relief in the North Carolina Supreme Court contending he was retarded under the provisions of N.C. Gen. Stat. § 15A-2005. The Supreme Court remanded the case to the Mecklenburg County Superior Court for a hearing on defendant's motion. *State v. McClain*, 355 N.C. 208; 560 S.E.2d 151 (2002). On 13 April 2004, the Honorable Charles C. Lamm, Jr., found defendant was mentally retarded within the meaning of N.C. Gen. Stat. § 15A-2005(a)(1) and vacated defendant's death sentence. As a result, the Supreme Court transferred defendant's appeal of his first-degree murder conviction to this Court. *State v. McClain*, 358 N.C. 374; 599 S.E.2d 906 (2004).

**[1]** In his first assignment of error, defendant contends the trial court erred in determining he was competent to stand trial. We disagree.

N.C. Gen. Stat. 15A-1001(a) sets out the test for competency of a defendant to stand trial. The test is " 'whether a defendant has capacity to comprehend his position, to understand the nature of the proceedings against him, to conduct his defense in a rational manner and to cooperate with his counsel . . . .' " *State v. Pratt*, 152 N.C. App. 694, 697, 568 S.E.2d 276, 278 (2002), *appeal dismissed and cert. denied*, 357 N.C. 168, 581 S.E.2d 442 (2003) (quoting *State v. Jackson*, 302 N.C. 101, 104, 273 S.E.2d 666, 669 (1981)). The defendant bears the burden of demonstrating he is incompetent. *Id.* If the trial court's findings of fact are supported by competent evidence, they are deemed conclusive on appeal. *Id.* Furthermore, the trial court's decision that defendant was competent to stand trial will not be overturned, absent a showing that the trial judge abused his discretion. *Id.* at 698, 568 S.E.2d at 279. Evidence that a defendant suffers from mental retardation is not conclusive on the issue of competency. *See id.* at 697, 568 S.E.2d at 278. A defendant need not be "at the highest stage of mental alertness to be competent to be tried." *Id.* at 697, 568 S.E.2d at 279 (citing *State v. Shytle*, 323 N.C. 684, 689, 374 S.E.2d 573, 575 (1989).

Dr. Robert Rollins, the Director of Forensic Psychiatry at Dorothea Dix Hospital, and a board certified expert in the field of forensic psychiatry, testified on behalf of the State. After interviewing defendant on three separate occasions and reviewing his records and test scores, Dr. Rollins concluded defendant was competent to stand trial. Dr. Rollins opined that although defendant suffered from "borderline intellectual functioning," and found it difficult to cope with the stress of the legal process, he was nevertheless able to understand the nature and object of the proceedings against him. He further concluded that with proper support, defendant was "certainly . . . able to cooperate with his attorneys" and assist in his own defense, although his attorneys might need to assign him very specific tasks and he would need additional time to complete the tasks given.

Dr. Mark Worthen testified for defendant as an expert in clinical and forensic psychology. Dr. Worthen testified defendant was not competent to stand trial based upon several factors. He stated that defendant's mental retardation, coupled with his inability to deal with stress, would interfere with his ability to aid his attorneys with his

defense. Dr. Worthen gave several recommendations, which he believed would improve defendant's competence if implemented. Dr. Rollins agreed that Dr. Worthen's recommendations would help, but stated it was unnecessary that they be implemented before the trial could proceed. Despite Dr. Worthen's conclusion that defendant was unable to assist in his defense, he acknowledged defendant had at least a rudimentary understanding that he was on trial for murder and was facing life in prison or the death penalty. He testified that defendant trusted his attorneys and that defendant "seemed to understand at least to some extent, the importance of working in a collaborative manner with [his attorneys]." On cross-examination, Dr. Worthen testified as to defendant's responses to questions posed as part of the CAST-MR test, which is administered to determine competency of persons with mental retardation. The trial court found that defendant's answers to the questions indicated he understood the events surrounding the shooting and murder charge.

After hearing this evidence, the trial court found defendant was competent to stand trial. The court declined to postpone the trial in order to implement some of Dr. Worthen's recommendations, but did modify the manner in which the trial was conducted to allow defendant more frequent breaks and longer breaks following the testimony of each witness so that defendant's attorneys could consult with defendant regarding witness testimony, explain anything he did not understand, and to solicit questions or relevant information from him.

There was sufficient evidence from which the trial judge could find that defendant was competent to stand trial. In defendant's answers to the CAST-MR test, he stated he was arrested for shooting Evans, he recited when and where the shooting occurred, he stated that he knew the charges against him were serious and that if convicted he faced life in prison or the death penalty. Dr. Rollins also gave his opinion that defendant's competency as it related to his ability to stand trial was not dependent upon implementation of Dr. Worthen's recommendations. The trial court found: (1) defendant was able to understand the nature and object of the proceedings against him; (2) he comprehended his situation in regard to the trial; and (3) defendant had the ability to assist in his defense in a rational and reasonable manner. These findings were supported by the evidence, which in turn supported the trial court's conclusion that defendant was competent to stand trial under the test set forth in N.C. Gen. Stat. § 15A-1001(a). We discern no abuse of discretion by the trial court in

concluding that defendant was competent to stand trial. This assignment of error is without merit.

[2] Defendant further argues that the trial court erred in denying his motion to continue, which he made immediately following the trial court's ruling that he was competent to stand trial.

A motion for a continuance is addressed to the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *State v. Boggess*, 358 N.C. 676, 685, 600 S.E.2d 453, 459 (2004). After careful review of the trial court's ruling at the competency hearing, we discern no abuse of discretion. This argument is without merit.

[3] In defendant's second assignment of error he contends the trial court's instructions on the element of deliberation were incorrect and lessened the State's burden to show this element of first-degree murder. We disagree.

In its initial charge to the jury, the trial court instructed the jury in accordance with the pattern jury instructions on the crimes of first-degree murder, second-degree murder, and on diminished capacity. At the jury charge conference, defense counsel requested the court give additional instructions on diminished capacity from *State v. Buchanan*, 287 N.C. 408, 215 S.E.2d 80 (1975). The trial court declined to give the requested instructions. During its deliberations, the jury requested the "5 components of first-degree murder," and that they be in writing for them to review. The trial judge reinstructed the jury on the elements of first-degree murder and directed a written copy of those elements be given to the jury. Subsequently, the jury requested "a legal interpretation" of deliberation, one of the elements of first-degree murder. They also requested an explanation of "cool state of mind" in relation to "total absence of passion or emotion." The trial court conducted a conference with counsel outside of the presence of the jury. The judge informed counsel it was going to give an instruction on deliberation consisting of language drawn directly from the Supreme Court case of *State v. Ruof*, 296 N.C. 623, 252 S.E.2d 720 (1979). Defense counsel objected, stating "I would ask that you not read that part about satisfying revenge and all that stuff." Defense counsel further requested the court give the definition of deliberation as found in *State v. Buchanan*. The trial court declined to do so and instructed the jury from *State v. Ruof* as follows:

> Deliberation means an intention to kill executed by one while in a cool state of blood in furtherance of a fixed design to gratify a

feeling of revenge or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause, or legal provocation.

Cool state of blood, as used in connection with premeditation and deliberation, does not mean absence of passion and emotion, but means that an unlawful killing was deliberate and premeditated if executed with a fixed design to kill, notwithstanding that the Defendant was angry or in an emotional state at the time.

After further deliberation, the jury requested a copy of the definition of deliberation. The trial court returned the jury to the courtroom and reinstructed it using the language from *Ruof*. After further deliberations, the jury found defendant guilty of first-degree murder.

Defendant contends the supplemental instructions from *State v. Ruof* unconstitutionally reduced the State's burden of proof as to the element of deliberation. He asserts the instruction confused the level of provocation necessary to negate malice with that necessary to negate deliberation.

While defense counsel did object to the trial court's supplemental instruction from *Ruof*, at no time did he assert as a basis for that objection the constitutional grounds now being argued to this Court. Rather, the basis of his objection was simply that he wanted the trial court to give an instruction on deliberation from *Buchanan* because he perceived it to be more favorably worded towards defendant than the language in *Ruof*. At no time did defendant assert the language from *Ruof* impermissibly lessened the State's burden of proof as to the element of deliberation. It is well settled that constitutional issues which are not raised and ruled upon in the trial court will not be reviewed for the first time on appeal. *State v. Golphin*, 352 N.C. 364, 403-04, 533 S.E.2d 168, 197 (2000). *See also* N.C. R. App. P. 10(b)(1). Furthermore, a defendant may not " 'swap horses between courts to get a better mount' " in the reviewing appellate court. *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (quoting *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934)).

Assuming *arguendo* that this issue is properly before this Court, we conclude the trial court did not err in instructing the jury on the element of deliberation using language from *State v. Ruof*.

Once a jury retires to deliberate, the trial judge may give appropriate additional instructions in response to the jury's inquiries. N.C. Gen. Stat. § 15A-1234(a)(1) (2004). A trial court is not required to

instruct the jury using the exact language counsel requests, as that is a matter left to the judge's discretion. *State v. Lewis*, 346 N.C. 141, 145, 484 S.E.2d 379, 381 (1997). " 'As long as the trial court gives a requested instruction in substance, it is not error for a trial court to refuse to give a requested instruction verbatim, even if the request is based on language from [our Supreme] Court.' " *Id.* at 146, 484 S.E.2d at 382 (citations omitted). In addition, where the trial court's instructions to the jury, taken as a whole, present the law fairly and clearly to the jury, no error will be found. *State v. Nicholson*, 355 N.C. 1, 59, 558 S.E.2d 109, 147 (2002).

Upon consideration of all of the instructions given, we conclude the trial court properly instructed the jury on the element of deliberation. First, the initial instructions on deliberation were proper and comported with the pattern jury instructions on first-degree murder. Second, *State v. Ruof* is a correct statement of the law and the language contained in *Ruof*, which defines deliberation, has been cited with approval by our Supreme Court on several occasions. *See Lewis*, 346 N.C. at 146, 484 S.E.2d at 381-82; *State v. Crawford*, 344 N.C. 65, 74, 472 S.E.2d 920, 926 (1996).

Defendant seeks to parse the words of the trial court's instruction from *State v. Ruof* solely in the light of his argument of diminished capacity. The evidence in the case demonstrated that defendant had a grudge against Evans arising out of a workplace dispute. The shooting was not the result of a suddenly aroused, violent passion, as defendant's last confrontation with Evans occurred two days prior to the shooting. Further, defendant did not kill Evans until several hours after he was discharged from his job and after he had kidnapped and assaulted Lowery. *See State v. Watson*, 338 N.C. 168, 177-78, 449 S.E.2d 694, 700 (1994) (holding the evidence failed to show the shooting was the result of a sudden and violent passion where he obtained a gun and placed it by his side in his truck before the defendant and victim ever quarreled, and the defendant had time to cool down because he returned to his truck following the argument, and only after that did he retrieve the gun, walk over to the victim, and shoot him), *cert. denied*, 514 U.S. 1071, 131 L. Ed. 2d 569 (1995), *overruled on other grounds, State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995).

After reviewing the trial court's instructions to the jury as a whole and construing them contextually, we conclude the charge as a whole was correct. This assignment of error is without merit.

**[4]** In his third assignment of error, defendant contends the trial court erred by allowing the prosecution to peremptorily excuse an African-American prospective juror, Allison Young, on the basis of her race.

The Fourteenth Amendment to the United States Constitution, as well as Article 1, § 26 of the North Carolina Constitution, prohibit litigants from exercising peremptory juror challenges on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); *State v. Crandell*, 322 N.C. 487, 501, 369 S.E.2d 579, 587 (1988). The United States Supreme Court has set forth a three-step analysis for evaluating claims of racial discrimination in the use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

> First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

*State v. Cummings*, 346 N.C. 291, 307-08, 488 S.E.2d 550, 560 (1997) (citing *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405). The trial court is in the best position to judge the prosecutor's credibility, thus its determination will not be overruled absent clear error. *Id.* at 309, 488 S.E.2d at 561.

We need not address the first step in this analysis because once a prosecutor offers a race-neutral reason for the peremptory challenge, and the trial court subsequently rules on whether there was intentional discrimination of a juror based on their race, "the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405.

To rebut a *prima facie* case of discrimination, the prosecution must " 'articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group.' " *Cummings*, 346 N.C. at 308-09, 488 S.E.2d at 560 (citations omitted). At this stage, the issue is the *facial* validity of the prosecutor's explanation, and absent a discriminatory intent, which is inherent in the reason, the explanation given will be deemed race-neutral. *State v. Hardy*, 353 N.C. 122, 128, 540 S.E.2d 334, 340 (2000).

The State articulated two reasons for the exercise of this peremptory challenge. First, the prosecutor stated that Young expressed hesitancy concerning her ability to impose the death penalty. When the prosecutor inquired whether any of the jurors had any feeling about the death penalty which would impair their ability to perform the duty of a juror, Young responded that she was "against killing whether it be legal or illegally." She further explained that her opposition was based on religious, moral, and philosophical beliefs she had held since childhood. Hesitancy on death penalty questions is a race-neutral reason for excusing a juror. *Cummings*, 346 N.C. at 310, 488 S.E.2d at 561; *State v. Best*, 342 N.C. 502, 512-13, 467 S.E.2d 45, 52 (1996).

Defendant contends Young was not hesitant in giving her answer. Hesitancy can be manifested by demeanor as well as words. The trial judge was in the best position to resolve this issue, having heard and seen the responses of the prospective juror, including her facial expressions, tone of voice, reactions, and other nuances that are not subject to translation when reviewing a cold record on appeal. *See State v. Smith*, 328 N.C. 99, 127, 400 S.E.2d 712, 727-28 (1991).

The second reason the prosecutor gave for excusing Young was that her brother had previously been convicted of armed robbery. The criminal conviction of a potential juror's relative has been recognized as a race-neutral reason for the exclusion of that juror by peremptory challenge. *See United States v. Johnson*, 941 F.2d 1102, 1109-10 (10th Cir. 1991); *United States v. Hughes*, 911 F.2d 113, 114 (8th Cir. 1990). For this reason, we afford great deference to the trial court's ruling.

Defendant argues the State accepted white jurors who gave similar responses and this demonstrates the State's discriminatory intent. Our Supreme Court rejected such an approach, stating that just because some of the remarks made by the stricken juror have also been made by other potential jurors the prosecutor did not challenge, does not require a finding that the reason given by the State was pretextual. *State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 153 (1990). This is so because " '[a] characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics.' " *Id.* (citations omitted).

The trial court concluded the State had not engaged in the "exercise of [a] peremptory challenge in a discriminatory fashion based on race." In support of its conclusion, the trial court found that: (1) at

the time defendant raised the *Batson* challenge, the State had used five peremptory challenges and none of those were against African-Americans; (2) only the defense had peremptorily excused an African-American; and (3) one-fourth of the jury seated at the time of the challenge was African-American. In light of the principles stated above and the additional findings of the trial court, the trial court's determination that there was no purposeful discrimination in the challenge of prospective juror Young was not erroneous. This assignment of error is without merit.

**[5]** In his fourth assignment of error, defendant contends the trial court erred in allowing Robin Lowery, a lay witness, to testify that defendant was not mentally retarded.

Rule 701 of the Rules of Evidence permits lay witness opinion if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [her] testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2004). Our Supreme Court has held that "the mental condition of another is an appropriate subject for lay opinion." *State v. Bond*, 345 N.C. 1, 31, 478 S.E.2d 163, 179 (1996). Thus, it is proper for a lay witness to testify as to an individual's mental condition when they have had the opportunity to observe that person. *Id.*

At trial, the following relevant exchange occurred:

Q. In terms of his mental abilities, how did the Defendant appear to you?

[DEFENSE COUNSEL]: Well, objection as to how he appeared.

COURT: Overruled.

A. He was fine. I mean we functioned on a day-to day basis. He basically had the say over where he went and what he had to do and what he had to wear. I mean, you know, he didn't appear to be, you know, anything wrong. He would act a certain way around different people and he was kind of quiet, but when we was together, you know, he was a different person. I mean, you know, he told me what to do and, you know, we fussed and fight, stuff like that, but he wasn't mentally retarded.

Robin Lowery had ample opportunity to observe defendant and form an opinion as to his mental condition. She had lived with defendant, saw him on a daily basis, and had the opportunity to observe him in various situations. This testimony was relevant as to whether defend-

ant had the necessary *mens rea* for first-degree murder and helpful to a clear understanding of a fact in issue. Even though Lowery testified that defendant was not mentally retarded, when read in context, it demonstrates she was not giving an expert opinion. Rather, she apparently used the phrase "mentally retarded" to describe defendant's ability to function on a daily basis in shorthand form. *See State v. Goss*, 293 N.C. 147, 154, 235 S.E.2d 844, 849 (1977) (holding witness's use of the term "rape" did not constitute an opinion on a question of law, as it was merely a "convenient shorthand term, amply defined by the balance of her testimony"); *State v. Chambers*, 52 N.C. App. 713, 718, 280 S.E.2d 175, 178 (1981). Furthermore, it is clear the State was not attempting to elicit expert testimony from Lowery regarding defendant's mental retardation. Thus, the trial court did not err in permitting Lowery to give her opinion as to defendant's mental capabilities. This assignment of error is without merit.

**[6]** In his fifth and final assignment of error, defendant contends the indictment charging defendant with first-degree murder was invalid because it did not allege all the elements of the crime charged.

Our Supreme Court has upheld short-form indictments for murder as constitutional. *State v. Hunt*, 357 N.C. 257, 272, 582 S.E.2d 593, 603 (2003). The indictment in this case is sufficient as it meets the requirements under N.C. Gen. Stat. § 15-144. It states: "The jurors for the state upon their oath present that on or about the 17th day of March, 1994, in Mecklenburg County, Robert Lewis McClain did unlawfully, wilfully, and feloniously and of malice aforethought kill and murder David D. Evans." This assignment of error is without merit.

For the reasons discussed herein, we find defendant received a fair trial, free of error.

NO ERROR.

Judge HUDSON concurs.

Judge WYNN concurs in result in a separate opinion.

WYNN, Judge concurring.

I join in the majority opinion except on the issue of whether the trial court properly allowed that part of Robin Lowery's lay testimony expressing the opinion that Defendant "wasn't mentally retarded."

As the majority notes, at trial, Lowery stated:

He was fine. I mean, we functioned on a day-to-day basis. He basically had the say over where he went and what he had to do and what he had to wear. I mean, you know, he didn't appear to be, you know, anything wrong. He would act a certain way around different people and he was kind of quiet, but when we was together, you know, he was a different person. I mean, you know, he told me what to do and, you know, we fussed and fight, stuff like that, but *he wasn't mentally retarded.*

Under Rule 701 of the Rules of Evidence, lay witness opinion testimony is admissible if it is: "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-701 (2004); *State v. Braxton*, 352 N.C. 158, 206, 531 S.E.2d 428, 456 (2000) (same).

This rule permits evidence which can be characterized as a "shorthand statement of fact." This Court has long held that a witness may state the "instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time." Such statements are usually referred to as shorthand statements of facts.

*Id.* at 187, 531 S.E.2d at 445 (quotation omitted).

Several North Carolina statutes have defined mental retardation as "significantly subaverage general intellectual functioning existing concurrently with" other deficits and limitations. *See, e.g.*, N.C. Gen. Stat. § 122C-3(23) (2004); N.C. Gen. Stat. § 15A-2005(a)(1) (2004). This Court has previously found that this definition "represents the plain meaning of the term 'mental retardation[.]' " *In re LaRue*, 113 N.C. App. 807, 811, 440 S.E.2d 301, 304 (1994). "[S]ignificantly subaverage general intellectual functioning" has been defined as "[a]n intelligence quotient of 70 or below." N.C. Gen. Stat. § 15A-2005(a)(1).

Here, Lowery testified as to her observations of how Defendant functioned on a daily basis and how he acted in certain situations. Such testimony was clearly admissible under Rule 701. However, Lowery also stated that Defendant "wasn't mentally retarded[,]" *i.e.*, that Defendant did not have a significantly subaverage general intellectual functioning. I do not believe that Lowery's statement that

Defendant was not mentally retarded could "rationally [be] based on the perception of the witness" and therefore believe that statement constituted improper lay opinion testimony.[1]

As the majority notes, and as made clear in the *Braxton* citation above, "the mental condition of another is an appropriate subject for lay opinion." *State v. Bond*, 345 N.C. 1, 31, 478 S.E.2d 163, 179 (1996). In *Bond*, testimony of a police officer that he did not think the defendant was mentally retarded was held admissible. Notably, however, in *Bond*, the testimony was allowed into evidence at a sentencing proceeding, where, as the *Bond* court explicitly noted, the Rules of Evidence do not apply but are merely guidance. Moreover, in support of the proposition that a person's mental condition is a proper subject for lay opinion, the *Bond* court cited *State v. Strickland*, 321 N.C. 31, 361 S.E.2d 882 (1987), in which our Supreme Court stated that " '[a] lay witness, from observation, may form an opinion as to one's mental condition and testify thereto before the jury.' " *Id.* at 38, 361 S.E.2d at 886 (quoting *State v. Moore*, 268 N.C. 124, 127, 150 S.E.2d 47, 49 (1966)). However, in both *Strickland* and *Moore*, the lay opinions at issue went to whether the respective defendant was or was not "in his right mind." There is a difference in kind between a person's sanity and a person's "significantly subaverage general intellectual functioning," or mental retardation, and the admissibility of lay testimony as to the former does not indicate the admissibility of lay testimony as to the latter.

While I believe the admission of Lowery's testimony that Defendant "wasn't mentally retarded[]" was error, that error was harmless. The record reflects that it was clear that Lowery was not an expert on mental retardation, and the State proffered expert testimony that Defendant was not mentally retarded and was capable of forming a plan and specific intent. Because the trial court's error was harmless, I concur in result with the majority.

---

1. It is also worth noting that Lowery's statement that Defendant was not mentally retarded directly contradicted the trial court's finding, albeit made subsequent to Defendant's trial, that "the Defendant has proven by a preponderance of the evidence that he is mentally retarded[.]"