STATE OF NORTH CAROLINA v. TYUS SENTELL HEADEN, DEFENDANT

No. COA09-606

(Filed 3 August 2010)

**Criminal Law— Batson challenge—race-neutral explanation— failure to show purposeful discrimination**

The trial court did not err in a voluntary manslaughter case by denying defendant's *Batson* challenge based on the State offering a race-neutral explanation and defendant failing to show purposeful discrimination. Heavy tattooing and inappropriate casual clothing, standing alone, are not unique to any particular race.

Appeal by defendant from judgment entered 21 August 2008 by Judge Ronald E. Spivey in Guilford County Superior Court. Heard in the Court of Appeals 28 October 2009.

**STATE v. HEADEN**

[206 N.C. App. 109 (2010)]

*Attorney General Roy Cooper, by Assistant Attorney General Mary Carla Hollis, for the State.*

*Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant.*

GEER, Judge.

Defendant Tyus Sentell Headen appeals from his conviction of voluntary manslaughter. Defendant, who is African-American, contends that the trial court erred in overruling his objection, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), to the State's peremptory challenge of a prospective juror who is also African-American. Defendant argues that he met his burden of making a *prima facie* showing of racial discrimination and that the State's explanation for the challenge was a pretext for a race-based strike.

Under the applicable standard of review, because the State volunteered its basis for the challenge before the trial court ruled on whether defendant had established his *prima facie* case, we consider whether the trial court's findings—that (1) the State offered a race-neutral explanation for its challenge and (2) defendant ultimately failed to prove the State purposefully discriminated—were clearly erroneous. Our review of the record shows that the State did offer a race-neutral explanation for its challenge, and we are not persuaded by defendant's arguments that the State's explanation was pretextual. We must, therefore, uphold the trial court's ruling.

### Facts

The State's evidence tended to establish the following facts. On the evening of 7 August 2005, following a rally at a local drag racetrack, a group of motorcycle riders gathered for an anniversary cookout sponsored by the Carolina Kings, a motorcycle club in Greensboro, North Carolina. The cookout was held at the home of club member Jeff Hinson. Defendant and an acquaintance, Terry Neal, were not members of the club, but they attended the cookout.

Defendant had recently withdrawn $4,500.00 and was carrying the cash in his pocket. At some point during the evening, Neal reached into defendant's pocket, and the two men began to scuffle. A gun fell onto the ground. Defendant picked up the gun, pointed it at Neal, and shot.

As Neal stumbled and ran toward the house, defendant followed with the gun. Witnesses saw defendant holding the gun, heard the gun being fired in the house, and saw blood in the house. Neal made his way out of the house and into the front yard, where he took a couple of deep breaths, gasped for air, and stopped breathing. Albert Glasco brought defendant outside and wrestled with him. The gun went off again, and the shot went into the ground. Defendant then left.

An autopsy performed on Neal revealed two gunshot wounds. One bullet pierced the muscle tissue of Neal's buttock and exited his right thigh. The other bullet, which the medical examiner estimated had been fired from less than two feet away, went through both of Neal's lungs and esophagus, exited the chest cavity, and lodged in his left upper arm. This wound, which ultimately caused Neal's death, resulted in both lungs collapsing, created a large amount of blood, and made it difficult for Neal to breathe.

Defendant was indicted for first degree murder on 6 September 2005. His case was first tried in October 2006, but the trial court granted the State's and defendant's joint motion for a mistrial after the jury indicated it was "hopelessly deadlocked." When the case came on for retrial in May 2008, the trial court dismissed the entire jury pool due to an error in the method by which the jurors were selected for service. Defendant's case was finally retried in July 2008.

At the retrial, defendant testified on his own behalf. He explained that he was standing near Neal at the party when Neal put his right hand in defendant's left pocket and took defendant's money. Defendant dropped his beer and grabbed Neal's right hand with both of his hands. According to defendant, Neal, with his left hand, brandished a gun in defendant's face. The two men started wrestling, and defendant grabbed at the top of the gun. The gun went off and fell between them. Neal backed up, stumbled, and ran fast toward the house. Defendant claimed he did not know how the gun went off and did not realize Neal had been shot.

Defendant picked up the gun and chased after Neal—not to shoot him, but to get his money back. In the house, when Glasco grabbed defendant, the gun went off again. Glasco marched defendant outside and tried to get him to calm down. They were wrestling when the gun went off for a third time. Defendant denied having brought the gun to the party or even owning or knowing much about guns. When he was asked about several kinds of ammunition that had been found in his

bedroom, he said that he had bought the ammunition for a friend who used it to make belts.

On 5 August 2008, the jury returned a verdict of guilty of voluntary manslaughter. The court sentenced defendant to a presumptive-range term of 75 to 99 months imprisonment. Defendant timely appealed to this Court.

## Discussion

In his sole argument on appeal, defendant contends that the trial court erred in determining that defendant did not make a *prima facie* showing of racial discrimination by the State in its use of one of its two peremptory challenges during jury selection. Defendant further contends that the court erred in finding that the State's explanation for its peremptory challenge was race-neutral and not pretextual. These errors, defendant claims, violated his constitutional right to a jury selected without regard to race.

Jury selection began on 29 July 2008 with the clerk calling the first panel of 12 prospective jurors, including juror number six, William Brooks, a black and Indian male. The prosecutor questioned the first panel, inquiring of Brooks, as he did with many of the other prospective jurors, as to where in the county he resided. After questioning the entire panel, the prosecutor announced that he would exercise two peremptory challenges. The prosecutor chose to strike Brooks and juror number one, a white male.

At that point, defense counsel informed the trial court that he intended to make a *Batson* challenge. The prospective jurors were escorted from the courtroom. Defense counsel noted for the record that defendant is African-American. Defense counsel then stated that in the first trial, "there appeared to be racial overtones from some members of the jury that could possibly caused [sic] that jury to be unable to reach a verdict." Defense counsel provided the court with no further explanation about what "racial overtones" may have existed.

Defense counsel also asserted that during the first attempt to retry the case, the bailiff overheard one of the prospective jurors—a black male—indicate "that he was going to find [defendant] not guilty regardless of any evidence that was presented." Defense counsel argued that Brooks was the only African-American male on the panel, but admitted that he could not tell whether juror number 11, a woman, was also African-American. Defense counsel then argued:

"There's a definite pattern that emerged between the first trial, I would contend, and what the jurors were overheard [sic] by the bailiffs during the second trial and it would fall right in line to excuse an African-American male in this case."

The trial court asked the State, "Did you wish to say something at this point, Mr. DA?" The prosecutor explained:

[As Brooks] walked in I observed that he was heavily tattooed up and down his arms. And was attired in baggy jeans hanging low with a big red, blood red color splotch on the back of the pocket, like splattered down the jeans. I observed that attire and those tattoos and I—again, it has nothing to do with his race, it just has to do with what he chose to wear to court today and his choice of applying, you know, that much ink. Maybe that's the wrong reason but I contend, Your Honor, that that's certainly something the State is inclined or able to take into account on an individual and I did so.

The prosecutor further noted that he had tried over 130 cases, and this was the first time he had ever faced a *Batson* challenge. Defense counsel responded, "I don't believe that my Batson challenge in any way, shape or form is a racial accusation against" the prosecutor, and he reiterated that he "simply [saw] what [he] call[ed] a pattern emerging."

The trial court then summoned Brooks back to the courtroom and asked him to state his race for the record. Brooks responded, "Black and Indian." The trial court excused Brooks from the courtroom and rendered its decision on defendant's *Batson* challenge:

Mr. Brooks has now identified that his heritage is black and Indian. . . .

The Court will now move on to consider relevant circumstances to determine whether or not the defendant has made out a prima facia case of a Batson violation.

The Court is going to consider the relevant circumstances, which would include pattern of peremptories against minorities, include intentional regular and repeated peremptories against minorities, disproportionate peremptories against minorities, the manner of jury selection including questions and remarks by the contested party during jury selection and the mannerisms of the contested party, the racial dynamics of the case.

At this point the Court is aware of—of purported race of the defendant and the purported race of the victim and the attorneys in the case, at least as it appears by sight, the past history of the parties, if any, including whether the challenge party has a habit, to the Court's knowledge, of systematically excluding minorities in case after case and the credibility of the plaintiff.

· The Court, after considering all of these factors, after this first round, if you will, of jury selection will find in my discretion that the defendant has not made out a prima facia case of any Batson violation.

The Court will go on to note that even though the Court did not request the State make any response, the State wished to make a response, apparently, and did so and stated reasons why Juror Number 1 and 6 were excused.

The Court will find that even if it could be argued that a prima facia case was made, which this Court will find it was not, the Court would then find again this an academic exercise at this point. The State has offered race neutral explanations for why they chose to excuse Juror Number 6, Mr. Brooks.

So the Court will find that at this stage of the trial there have been no Batson errors . . . .

In *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719, the United States Supreme Court explained that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Our Supreme Court has construed *Batson* as outlining a "three-part test for determining whether the state impermissibly excluded a juror on the basis of race": (1) "the defendant must make a prima facie showing that the state exercised a race-based peremptory challenge"; (2) "[i]f the defendant makes the requisite showing, the burden shifts to the state to offer a facially valid, race-neutral explanation for the peremptory challenge[]"; and (3) "the trial court must decide whether the defendant has proved purposeful discrimination." *State v. Taylor*, 362 N.C. 514, 527, 669 S.E.2d 239, 254 (2008), *cert. denied,* —— U.S. ——, 175 L. Ed. 2d 84, 130 S. Ct. 129 (2009).

"To allow for appellate review, the trial court must make specific findings of fact at each stage of the *Batson* inquiry that it reaches."

*State v. Cofield,* 129 N.C. App. 268, 275, 498 S.E.2d 823, 829 (1998). This Court "must uphold the trial court's findings unless they are 'clearly erroneous.' " *Id.* (quoting *State v. Barnes,* 345 N.C. 184, 210, 481 S.E.2d 44, 58, *cert. denied sub nom. Chambers v. North Carolina,* 522 U.S. 876, 139 L. Ed. 2d 134, 118 S. Ct. 196 (1997), *cert. denied,* 523 U.S. 1024, 140 L. Ed. 2d 473, 118 S. Ct. 1309 (1998)).[1] Under this standard, the fact finder's choice between two permissible views of the evidence " 'cannot' " be considered clearly erroneous. *Id.* at 276, 498 S.E.2d at 829 (quoting *Hernandez v. New York,* 500 U.S. 352, 369, 114 L. Ed. 2d 395, 412, 111 S. Ct. 1859, 1871 (1991)). We reverse "only" when, after reviewing the entire record, we are " 'left with the definite and firm conviction that a mistake ha[s] been committed.' " *Id.* (quoting *Hernandez,* 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871).

"Generally, when a trial court rules that the defendant has failed to establish a *prima facie* case of discrimination, this Court's review is limited to a determination of whether the trial court erred in this respect." *State v. Bell,* 359 N.C. 1, 12, 603 S.E.2d 93, 102 (2004), *cert. denied,* 544 U.S. 1052, 161 L. Ed. 2d 1094, 125 S. Ct. 2299 (2005). "When, however, the prosecutor volunteers his reasons to the trial court before the trial court rules, then, despite the trial court's ultimate ruling that defendant failed to establish a *prima facie* case, the appellate court proceeds as though the defendant had established a *prima facie* case and examines the prosecutor's explanations. In such a case, the appellate court considers the prosecutor's explanations pursuant to step two of *Batson,* and then proceeds to step three, inquiring whether the trial court was correct in its ultimate determination that the State's use of peremptory challenges did not constitute intentional discrimination." *State v. Mays,* 154 N.C. App. 572, 575, 573 S.E.2d 202, 205 (2002).

Thus, although defendant argues that the trial court erred in finding that defendant failed to make out a *prima facie* case of discrimination, "[w]hether defendant established a *prima facie* case is moot as the prosecutor here 'volunteer[ed] his reasons for the peremptory challenges . . . .' " *State v. Wright,* 189 N.C. App. 346, 352, 658 S.E.2d 60, 64 (quoting *State v. Williams,* 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996), *cert. denied,* 519 U.S. 1061, 136 L. Ed. 2d 618, 117 S. Ct.

---

1. "Normally our state appellate courts utilize an 'any competent evidence' standard of review of the findings of fact entered by the trial court. The 'clear error' standard is a federal standard of review adopted by our courts for appellate review of the *Batson* inquiry." *Cofield,* 129 N.C. App. at 275 n.1, 498 S.E.2d at 829 n.1 (internal citation omitted).

695 (1997)), *disc. review denied*, —— N.C. ——, 667 S.E.2d 280 (2008). The sole issues before this Court are whether the trial court's findings as to the second and third steps of *Batson* are clearly erroneous. *Bell*, 359 N.C. at 12, 603 S.E.2d at 102.

Accordingly, we first review the trial court's finding that the State offered a race-neutral explanation for striking Brooks. "To rebut a *prima facie* case of discrimination, the prosecution must 'articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group.' " *State v. McClain*, 169 N.C. App. 657, 668, 610 S.E.2d 783, 791 (2005) (quoting *State v. Cummings*, 346 N.C. 291, 308-09, 488 S.E.2d 550, 560 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873, 118 S. Ct. 886 (1998)). The State's explanation "need not 'rise to the level justifying a challenge for cause,' and need not be 'persuasive, or even plausible.' " In fact, the challenges may be based on . . . counsel's 'legitimate hunches . . . .' " *Cofield*, 129 N.C. App. at 277, 498 S.E.2d at 830 (internal citation omitted) (quoting *Barnes*, 345 N.C. at 209, 481 S.E.2d at 57). The issue at this stage is mere "*facial* validity," and "absent a discriminatory intent, which is inherent in the reason, the explanation given will be deemed race-neutral." *McClain*, 169 N.C. App. at 668, 610 S.E.2d at 791.

In this case, the State's explanation for peremptorily challenging Brooks included that Brooks was "heavily tattooed up and down his arms" and was "attired in baggy jeans hanging low with a big red, blood red color splotch on the back of the pocket, like splattered down the jeans." The prosecutor expressed concern over what Brooks "chose to wear to court today and his choice of applying . . . that much ink."

Courts from other jurisdictions have found similar explanations about clothing and tattoos to be sufficiently race-neutral to satisfy the second step of *Batson*. *See, e.g., United States v. Jones*, 245 F.3d 990, 993 (8th Cir. 2001) ("[T]he veniremember's grooming may be a sufficiently race neutral explanation, as may his style of dress . . . ." (internal citation omitted)); *State v. Washington*, 288 S.W.3d 312, 316 (Mo. Ct. App. E.D. 2009) (noting "distinctive tattoo" would be " 'individualistic' trait[]" that "could have applied equally to any venireperson"); *State v. Williams*, 97 S.W.3d 462, 471 (Mo.) ("Striking a prospective juror based upon clothing and attire is [sic] does not reflect an inherent racial bias motivating the strike."), *cert. denied*, 539 U.S. 944, 156 L. Ed. 2d 631, 123 S. Ct. 2607 (2003); *Knuckles v. State*, 236 Ga. App.

449, 452-53, 512 S.E.2d 333, 337 (1999) ("[U]nconventional methods of self-adornment in attire, hair style, hair color, shaving the head, jewelry, tattoos, or scarification, may indicate youthful rebellion against authority and convention, or anti-social attitudes, or identification that would extend across gender and racial lines. Such may constitute a race/gender-neutral reason to strike.").

Consistent with these other jurisdictions, we conclude that the reason proposed by the State in this case was race-neutral. Heavy tatooing and inappropriate, casual clothing—standing alone—is not unique to any particular race, but rather crosses racial lines. Further, in a murder case, concern about a prospective juror's wearing clothes made to appear blood-spattered is both a race-neutral concern and one particularly related to the subject matter of this case. We, therefore, hold that the trial court's finding that the State's explanation was race-neutral is not clearly erroneous.

Next, we move to the third step of *Batson* and consider whether the trial court's finding that there was ultimately no *Batson* error was clearly erroneous. In the third step, the defendant may introduce evidence that the State's explanation is merely a pretext, and " 'the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.' " *State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408 (quoting *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177, 118 S. Ct. 248 (1997). This stage is where the " 'persuasiveness of the justification [offered by the State] becomes relevant . . . .' " *State v. Wiggins*, 159 N.C. App. 252, 262, 584 S.E.2d 303, 312 (quoting *Purkett v. Elem*, 514 U.S. 765, 768, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1771 (1995)), *disc. review denied*, 357 N.C. 511, 588 S.E.2d 472 (2003), *cert. denied*, 541 U.S. 910, 158 L. Ed. 2d 256, 124 S. Ct. 1617 (2004).

In attempting to show that the State's explanation was pretextual, a defendant may proceed by showing "that the reasons presented 'pertained just as well to some white jurors who were not challenged and who did serve on the jury.' " *State v. McCord*, 158 N.C. App. 693, 696, 582 S.E.2d 33, 35 (2003) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 343, 154 L. Ed. 2d 931, 954, 123 S. Ct. 1029, 1043 (2003) ("*Miller-El I*")). Other factors that a defendant may rely upon in showing pretext include "the defendant's race, the victim's race, and the race of the State's key witnesses[;] . . . whether the prosecutor made racially motivated statements or asked racially motivated questions of black prospective jurors and whether there was a discernable difference in

the prosecutor's method of questioning black prospective jurors that raises an inference of discrimination[;] . . . [and] whether the prosecutor used a disproportionate number of peremptory challenges to strike black jurors in a single case." *State v. Gregory,* 340 N.C. 365, 397-98, 459 S.E.2d 638, 656 (1995), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478, 116 S. Ct. 1327 (1996).

We note first that the requirement under *Batson* is purposeful discrimination; disparate impact is not sufficient. *See United States v. Roberts,* 163 F.3d 998, 999 (7th Cir. 1998) (*"Batson* establishes a rule of disparate treatment, not of disparate impact . . . ."). In other words, a defendant must demonstrate that the State intentionally challenged the prospective juror based on his or her race. It is not enough that the effect of the challenge was to eliminate all or some African-American jurors. On this point, the State argues with some persuasive force that defense counsel's admission at trial that he was not making "in any way, shape or form . . . a racial accusation against" the prosecutor was inconsistent with the requirement of purposeful discrimination.

On the other hand, the statement may also be read as defense counsel's saying he did not think the prosecutor was a racist, but that the prosecutor was using the strike for a strategic purpose because prior African-American jurors or prospective jurors had exhibited a reluctance to convict defendant. Strategically using a race-based strike is just as much a violation of *Batson.* Thus, we turn to the merits of defendant's arguments regarding pretext.

Defendant purports to rely extensively on the statistics involved in this case. Defendant argues that the prosecutor used "half of his strikes . . . against African Americans." In addition, defendant claims that by excluding Brooks, the prosecutor "prevented his acceptance of any African Americans . . . . His acceptance rate of African Americans was zero." Defendant did not, however, sufficiently establish that latter fact at trial. Defense counsel admitted that "by appearance, I cannot tell if [prospective juror] Ms. Campbell is of African-American decent [sic] or not." If Campbell, who was accepted as a juror, is African-American, then the "statistics" would indicate that the State accepted 50% of the African-American prospective jurors. As this disparity in the possible "acceptance rate[s]" demonstrates, reliance upon statistics is meaningless when the the jury pool contains only one or two African-Americans.[2]

2. We note that defendant has not suggested that any racial discrimination occurred in the selection of the jury pool.

Defendant nonetheless repeatedly points to *Miller-El v. Dretke*, 545 U.S. 231, 241, 162 L. Ed. 2d 196, 214, 125 S. Ct. 2317, 2325 (2005) (*"Miller-El II"*), as "emphasiz[ing] the constitutional significance of the numerical disparities in the use of peremptory strikes against prospective jurors because of gender or race." Defendant's reliance on *Miller-El II* is misplaced.

In *Miller-El I* and *Miller-El II*, the United States Supreme Court was concerned about the prosecution's "remarkable" use of peremptory challenges against African-Americans: "Out of 20 black members of the 108-person venire panel for Miller-El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. 'The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members[.]' " *Miller-El II*, 545 U.S. at 240-41, 162 L. Ed. 2d at 214, 125 S. Ct. at 2325 (internal citation omitted) (quoting *Miller-El I*, 537 U.S. at 342, 154 L. Ed. 2d at 953, 123 S. Ct. at 1042). The Court recognized that " '[h]appenstance is unlikely to produce this disparity.' " *Id.* at 241, 162 L. Ed. 2d at 214, 125 S. Ct. at 2325 (quoting *Miller-El I*, 537 U.S. at 342, 154 L. Ed. 2d at 953, 123 S. Ct. at 1042).

"[I]t is axiomatic in statistical analysis that the precision and dependability of statistics is directly related to the size of the sample being evaluated." *Moultrie v. Martin*, 690 F.2d 1078, 1083 (4th Cir. 1982). *See also Capitol Hill Hosp. v. Baucom*, 697 A.2d 760, 765 (D.C. 1997) (recognizing "statistics may be less elucidating when based on a small sample"). The numbers in this case—by defendant's count, a sample size of one—are not at all analogous to *Miller-El I* and *Miller-El II*—which had a larger sample size of 11. We question whether we can derive any "remarkable" inference from a sample size of one. *Miller-El II*, 545 U.S. at 240, 162 L. Ed. 2d at 214, 125 S. Ct. at 2325. *See Wade v. Terhune*, 202 F.3d 1190, 1198 (9th Cir. 2000) (where one of three of prosecutor's peremptory challenges had been exercised against African-American, and only four of 64 of prospective jurors in venire were African-American, observing "that the sample is so small that the statistical significance of the percentages is limited"). *See also State v. Nicholson*, 355 N.C. 1, 22, 558 S.E.2d 109, 125 ("While the state did exercise its first two peremptory challenges to excuse African-American jurors, those excusals took place too early in *voir dire* to establish a pattern of discrimination."), *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71, 123 S. Ct. 178 (2002).

We, therefore, find no persuasive value in defendant's claim that the State excluded 100% of the African-American prospective jurors

and that 50% of the State's challenges were used against African-American prospective jurors. Based on the jury pool's containing only one or two African-Americans, and the State's exercising only two peremptory challenges, we cannot say in this case that " '[h]appenstance is unlikely to produce [the] disparity . . . .' " *Miller-El II*, 545 U.S. at 241, 162 L. Ed. 2d at 214, 125 S. Ct. at 2325 (quoting *Miller-El I*, 537 U.S. at 342, 154 L. Ed. 2d at 953, 123 S. Ct. at 1042).

Defendant also points to his argument in the trial court that the State's peremptory challenge should be considered "in light of" the procedural history of the case and the "definite pattern that emerged" because "it would fall right in line to excuse an African-American male in this case." Here, in order to establish a basis for the State's strategic exclusion of a black juror, defense counsel relied on what had occurred at defendant's first trial and at the first attempt to retry the case. Defendant did not, however, present any evidence to support his counsel's assertions regarding what occurred during the prior proceedings.

While defendant did submit to this Court a transcript of the jury selection at the first attempted retrial, there is nothing in the record to indicate that this transcript was provided to the trial court for consideration in connection with the *Batson* challenge. In fact, the cover page of that transcript indicates that the transcript was ordered on 8 August 2008 and delivered on 15 December 2008—after the *Batson* ruling and after defendant was tried and convicted. This Court "cannot review evidence which was not considered by the trial court in its analysis." *Gupton v. Son-Lan Dev. Co.*, 205 N.C. App. 133, 138, 695 S.E.2d 763, 767 (2010). *See also State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991) ("This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal.").

Defense counsel's statements regarding what occurred in the prior proceedings do not constitute evidence. As our Supreme Court has stated, "it is axiomatic that the arguments of counsel are not evidence." *State v. Collins*, 345 N.C. 170, 173, 478 S.E.2d 191, 193 (1996). *See also State v. Crouch*, 74 N.C. App. 565, 567, 328 S.E.2d 833, 835 (1985) ("Defendant presented no evidence. His position with respect to his inability to comply was related through the statements of his counsel. We hold that counsel's statements were not competent evidence . . . ."). Defendant bore the burden of demonstrating pretext. Since he did not present evidence to the trial court to support his contentions regarding the "racial overtones" in the prior proceedings,

the prior proceedings cannot form a basis for overturning the trial court's decision.

Defendant also challenges the State's comments about Brooks' clothing and tattoos as being a pretextual basis for excluding a black male from the jury. *See Knuckles*, 236 Ga. App. at 453, 512 S.E.2d at 337 (holding that if an aspect of a juror's physical appearance disfavored by State "[is] shown to be *unique* to a racial or gender identification, then it could constitute an impermissible explanation," but "such exclusive identification with race or gender would be part of the movant's ultimate burden of persuasion"). Defendant has not shown that Brooks' type of clothing or tattoos are exclusively identifiable with African-Americans, but rather suggests that the State's reason must be pretextual because the prosecutor "did not ask Mr. Brooks about his tattoos or his attire" and "[m]ore importantly, he did not ask any other prospective juror if he or she had a tattoo or ever wore baggy pants."

As the prosecutor explained, however, the issue was not whether a person had ever worn baggy pants or had a covered-up tattoo, but rather "what [Brooks] chose to wear to court today and his choice of applying, you know, that much ink." Defendant did not at trial point to any other prospective juror wearing inappropriate clothing for court or having extensive, visible tattoos. We do not believe that the prosecutor's failure to ask Brooks or any other prospective juror about readily visible features or attire is suggestive of racial discrimination. *Compare Snyder v. Louisiana*, 552 U.S. 472, 480-83, 170 L. Ed. 2d 175, 182-84, 128 S. Ct. 1203, 1209-1211 (2008) (remanding where challenged juror "was 1 of more than 50 members of the venire who expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations," other jurors' conflicts "appear[ed] to have been at least as serious" as that of challenged juror, and "shared characteristic" was "thoroughly explored" by trial court during *voir dire*).

We find this case similar to *State v. Augustine*, 359 N.C. 709, 714, 616 S.E.2d 515, 521 (2005), *cert. denied*, 548 U.S. 925, 165 L. Ed. 2d 988, 126 S. Ct. 2980 (2006), in which the Supreme Court concluded that no purposeful discrimination occurred when the defendant argued that the prospective juror in question "was the first African-American prospective juror to be considered, that the number of African Americans who had been summoned for the jury pool in this case was small, and that [she] had indicated during *voir dire* that she could consider both the death penalty and life imprisonment without

parole as potential punishments in this case." The Court reasoned that "numerous factors support[ed] the trial court's ruling": the case "was not particularly susceptible to racial discrimination" because the defendant, victim, and three critical witnesses were African-American; the State "neither made any racially motivated statements nor asked any racially motivated questions of" the African-American prospective juror; the State contemporaneously peremptorily challenged a white prospective juror; and the African-American prospective juror had a son near the defendant's age who was serving a sentence in federal prison. *Id.* at 716, 616 S.E.2d at 522.

In this case, as in *Augustine,* both defendant and the victim were African-American. *See also State v. Chapman,* 359 N.C. 328, 342, 611 S.E.2d 794, 808 (2005) ("[T]he shared race of the involved parties tends to contradict an inference of purposeful discrimination by prosecutors."); *Nicholson,* 355 N.C. at 22, 558 S.E.2d at 125 (finding no "inference of discrimination" where defendant, both victims, and two key State witnesses were African-American).

Our review of the record indicates that the State asked no racially motivated questions, and defendant has not contended otherwise. Brooks, like the other prospective jurors, stated his occupation and marital status for the record. The State asked Brooks only one question—where in the county he lived—and Brooks replied that he lived in the northern part of Guilford County. "There was no discernable difference in the prosecutor's method of questioning [Brooks] from the method of questioning the rest of the jury venire." *Gregory,* 340 N.C. at 398, 459 S.E.2d at 657.

In addition, like the prosecutor in *Augustine,* the State contemporaneously challenged both a black prospective juror and a white prospective juror. These were the only two peremptory challenges by the State. Defendant left unresolved the question whether one of the jurors, who was accepted by the State, was African-American.

Finally, Brooks had chosen to wear clothes to court that simulated blood-spattered clothing, and he was heavily tattooed. Defendant did not show that any other prospective jurors wore similarly inappropriate clothing or had comparable tattooing.

In view of the circumstances preserved in the record and under the applicable standard of review, we cannot conclude that the trial court's findings as to the State's race-neutral explanation or defendant's failure to show purposeful discrimination were clearly erroneous. We, therefore, hold that the trial court did not err in deny-

ing defendant's *Batson* challenge and in allowing the State to exercise its peremptory challenge.

No error.

Judges ROBERT C. HUNTER and CALABRIA concur.