IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-68

Filed: 7 July 2020

Moore County, Nos. 15 CRS 1841, 53404-07

STATE OF NORTH CAROLINA

v.

EDWARD LAMONT WOMBLE

Appeal from judgments entered 6 July 2018 by Judge James M. Webb in Moore County Superior Court. Heard in the Court of Appeals 9 June 2020.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Michael T. Wood, for the State.*

*Mark Montgomery for defendant-appellant.*

BRYANT, Judge.

On 6 July 2018, defendant Edward Lamont Womble was found guilty of first-degree rape, first-degree sexual offense, crime against nature, assault on a female, assault with a deadly weapon, assault by pointing a gun, possession of a firearm by a felon, and willfully communicating threats.[1]

_____

On 6 July 2018, defendant Edward Lamont Womble was found guilty of first-degree rape, first-degree sexual offense, crime against nature, assault on a female,

_____

[1] The jury acquitted defendant of first-degree kidnapping.

assault with a deadly weapon, assault by pointing a gun, possession of a firearm by a felon, and willfully communicating threats.[2]

*Factual and Procedural History*

The State's evidence at trial tended to show the following: defendant and Crystal were married on 25 August 2011. Together, they have one child, and Crystal had five other minor children. Defendant grew abusive toward Crystal during their marriage, and they separated in March 2013. After Crystal filed for divorce in March 2015 and before the divorce was finalized in January 2016, she and defendant began communicating about their son and saw each other regularly.

In November 2015, Crystal and her minor children lived in her mother's house outside of Carthage in Moore County. Defendant stayed at least part-time in the home of his girlfriend, Shantell Kimes, in Ramseur.

Ms. Kimes purchased two Cobra .380 caliber, semi-automatic pistols for defendant in 2015. The first gun, which Ms. Kimes purchased on 30 June 2015, was seized by law enforcement on 5 November 2015. The second gun was purchased by Ms. Kimes on 16 November 2015 and seized on 24 November 2015. At the time of defendant's trial, Ms. Kimes had pled guilty to federal gun charges stemming from these two straw purchases and was awaiting sentencing. She had hoped to obtain a lesser sentence as a result of her testimony against defendant.

---

[2] The jury acquitted defendant of first-degree kidnapping.

A. <u>The 5 November 2015 Incident</u>

On 5 November 2015, defendant and Crystal had an argument about their relationship while parked in her car in a church parking lot near her mother's house. When Crystal told defendant she would not reconcile with him, he slapped her and said, "You need to get away from me before I kill you." Crystal exited the car. Defendant took her place in the driver's seat and said, "You think I'm playing with you? . . . I'll shoot you and your kids[,]" before driving off in her car.

Crystal called 911 and reported that her "husband was going to get a gun to come back and shoot [her] and [her] kids." While still on the phone, Crystal heard her car returning[3] and hid behind a shed. Defendant drove past Crystal to her mother's house. Defendant asked Crystal's mother where Crystal was before proceeding onto McCrimmon Road toward State Highway 15-501. Crystal remained on the phone with 911 until law enforcement arrived at her location.

Responding to the 911 call, Detective Rodriguez and Captain Medlin of the Moore County Sheriff's Office stopped defendant's vehicle at the intersection of McCrimmon Road and Highway 15-501. Corporal Cameron also responded to the scene and observed Detective Rodriguez speaking to defendant beside a white Honda Civic. Defendant "stated that it wasn't his car and he stated it was registered to his wife, Crystal . . . ." After obtaining Crystal's consent to search the car, officers found

---

[3] Crystal testified her car was "loud" because it lacked a muffler.

"what appeared to be a half[-]burnt marijuana cigarette . . . in the small pocket of the [front] door." Corporal Cameron also found defendant's driver's license and "several small handgun caliber bullets . . . in the glove box," and a black Cobra .380 caliber, semi-automatic handgun under the passenger seat. Defendant was charged with multiple offenses related to the items seized during the traffic stop but was not taken into custody.

Captain Medlin drove to Barbers Park Drive to check on Crystal, who said "she had gotten into an argument with [defendant] over custody of a child and that the argument had escalated . . . to the point where he said he was going to leave to go get a gun and come back and shoot her and the kids." Captain Medlin advised Crystal to go to the magistrate's office to "swear out a warrant [against defendant] for communicating threats[.]" Crystal did so that same day and received an ex parte protection order from the trial court.

B. The 24 November 2015 Incident

Defendant spent the night of 23 November 2015 at Ms. Kimes's home in Ramseur and set an alarm clock for 4:30 a.m. Ms. Kimes asked why he was setting the alarm, and he replied, "So I can kill Crystal." When the alarm clock sounded on the morning of 24 November 2015, defendant got up, took a shower, and again told Ms. Kimes, "I'm going to kill Crystal." Defendant retrieved his Cobra .380 caliber, a

semi-automatic pistol, from Ms. Kimes's closet, and left in Ms. Kimes's white Nissan Altima.

Crystal drove her son to the bus stop at 5:30 a.m. on 24 November 2015. When the bus arrived, her son exited her car and boarded the bus. While Crystal was adjusting her car's heater and "not paying attention," defendant opened the car door, sat down in the passenger seat with a gun in his hand, and said, "You wasn't expecting this, was [sic] you?" Defendant told Crystal to drive to the home of James A. Gilmore, who lived on a dirt road near her mother's house. When they arrived in Mr. Gilmore's yard, defendant ordered Crystal out of her car and into the Altima. Crystal refused, and defendant struck her with his gun—hitting her on the top of her head and her right eyebrow. Crystal fell to the ground and dropped her phone in Mr. Gilmore's yard before getting into the Altima, her head "pouring" blood.

On the morning of 24 November 2015, Mr. Gilmore saw Crystal's car and cell phone in his yard, and found the circumstance to be "kind of strange" because Crystal had never parked her car at his house. He picked up the phone and walked to Crystal's mother's house. When Mr. Gilmore handed the phone to Crystal's mother and told her Crystal's car was in his yard, she asked Crystal's daughter to call 911. Lieutenant Williams and other members of the Moore County Sheriff's Office responded to the call and began an investigation into Crystal's disappearance.

Defendant drove Crystal to a boat landing on a dirt road near Carbonton, saying he was "going to kill [her], put [her] body in a ditch so [her children] can't find [her]." Defendant parked at the boat landing and asked Crystal for sex. Because defendant was holding her at gunpoint, Crystal engaged in oral and vaginal intercourse with him. After having sex with Crystal, he began to ask her, "Why did I do this? What am I going to do now? . . . I can't take you back."

Defendant returned with Crystal to Ms. Kimes's house and parked in the driveway. He tried to stab Crystal with a syringe full of insulin, which he used to treat his diabetes. When the needle broke off of the syringe, defendant drove away from Ms. Kimes's house and parked on a side street where he continued to fight with Crystal, biting her on the right hand.

After speaking to Crystal's mother, Lieutenant Williams called Detective Rodriguez, told him Crystal was missing, and asked him to go to defendant's mother's house and try to locate defendant. Detective Rodriguez went to defendant's mother's residence and asked her to "please contact [defendant] to see if he knew where Crystal was." Defendant's mother spoke to defendant on his cell phone and then gave Detective Rodriguez his phone number. Detective Rodriguez immediately called defendant and asked if he had seen Crystal. Defendant said he had not seen Crystal and did not know where she was. Approximately fifteen minutes later, Crystal phoned Detective Rodriguez and said she was fine and was visiting friends in

Asheboro. Detective Rodriguez asked Crystal to call Lieutenant Williams and verify she was okay.

Defendant next drove with Crystal to mechanic Joe Brady's garage in Siler City, where he asked Mr. Brady if he could take a "look at the Mazda out back" behind the garage. Defendant instead took a cup containing the broken syringe and the bloody tissues Crystal had used on her head wounds and deposited the cup in a "burn barrel" Mr. Brady kept on the property to burn trash. Mr. Brady remained in the garage but saw defendant "walk[] out back" in the direction of the Mazda.

As Crystal pleaded with defendant to take her home, he instead drove to the home of another friend in Siler City, Richard McSwain, who noticed a mark on Crystal's forehead. Defendant asked Mr. McSwain to "hold" defendant's gun, but he refused.

While at Mr. McSwain's house, Crystal borrowed a phone to call Lieutenant Williams. With defendant listening in on the call, Crystal told Lieutenant Williams she was visiting friends in Asheboro. Lieutenant Williams asked Crystal to go to the Asheboro Police Department to confirm she was safe. After the call, Crystal's family told Lieutenant Williams that Crystal "doesn't know anybody in Asheboro."

Lieutenant Williams contacted Detective Rodriguez and instructed him to return to defendant's mother's residence and serve defendant with the outstanding arrest warrant from the 5 November 2015 incident. Detective Rodriguez called

defendant, said he needed to take a statement from him, and asked to meet him at his mother's house. Defendant agreed and said he was approximately 45 minutes from his mother's house.

Defendant drove back to Ramseur and stopped at a BP gas station on State Highway 64. Defendant left Crystal at the BP station, saying he had to attend court in Carthage and would come back for her. Crystal entered the store and went into the restroom to tend to her still-bleeding head. When she emerged from the restroom, she asked the store's cashier if she could use the phone.

Diane Helms was working at the BP station when Crystal came inside with a wound on her forehead and asked to use the restroom. When Crystal emerged from the restroom, "[s]he was just kind of walking around, looking out the window" toward the gas pumps. Ms. Helms asked her what had happened. Crystal appeared "nervous and upset" and did not answer. A few minutes later, Crystal asked to use the phone and told Ms. Helms, "He has a gun."

After leaving Crystal at the BP station, defendant drove back to Ms. Kimes's residence and placed his .380 caliber handgun back in her bedroom closet. He then told Ms. Kimes, "Let's go, [be]cause the police is at my mama['s] house." As Ms. Kimes drove defendant back to the BP station to get gas, she noticed "a lot of blood in" her car.

Meanwhile, Crystal tried to call Detective Rodriguez, but he did not answer. She tried to call 911 to reach the Carthage police but hung up the phone when defendant arrived back at the BP station, accompanied by Ms. Kimes. Defendant put gas in Ms. Kimes's car and walked into the store to pay and check on Crystal, who promised to wait for him to come back for her. After defendant left the store and drove off with Ms. Kimes, Crystal called Lieutenant Williams and revealed what had happened to her. Lieutenant Williams told Crystal to wait for her in the store.

Defendant and Ms. Kimes drove from the BP station to his mother's house in Carthage, where they were met by sheriff's deputies. Detective Rodriguez arrested defendant on the outstanding warrant for the domestic violence protection order, and Deputy Godfrey transported defendant to the sheriff's office. Ms. Kimes also drove to the sheriff's office, where she was interviewed and consented to a search of her car and her bedroom closet where defendant had placed the handgun.

Captain Hart and Detective Fogle transported Ms. Kimes from the sheriff's office to her residence in Ramseur to retrieve the weapon. After obtaining the loaded .380 caliber pistol from a "white plastic container on top of the master bedroom closet," they drove Ms. Kimes back to the sheriff's office. Lieutenant Holders conducted a recorded interview with Ms. Kimes, which was published to the jury.

Defendant waived his *Miranda* rights and was interviewed by Detective Rodriguez at the sheriff's office. Defendant initially claimed he had spent the day at

Ms. Kimes's residence.    Confronted with the information Lieutenant Holders obtained from Ms. Kimes, however, defendant "started crying" and said, "I'm done. I'm done." Defendant "admitted to lying to [Detective Rodriguez] and that. . . he had been with Ms. Crystal Womble." A copy of the audio-video recording of defendant's interview was admitted into evidence and published to the jury.

Investigator Lowery drove with Lieutenant Williams to meet Crystal at the BP station in Ramseur. He observed a laceration on Crystal's face and saw that she was upset and crying. On the way to the hospital, Crystal told the deputies about her abduction by defendant and led them to the series of locations he had taken her, including Mr. Brady's garage and the boat landing. Lieutenant Williams retrieved the cup containing the syringe and bloody tissues from the burn barrel on Mr. Brady's property. After visiting the boat landing, the deputies drove Crystal to FirstHealth Moore Regional Hospital.

While awaiting medical attention, Crystal gave a partial statement about the day's events to Investigator Lowery. Hospital personnel used five stitches to close the wound on Crystal's forehead; they also x-rayed her right hand and administered a sexual assault kit evidence collection. After being released from the hospital, Crystal was taken to the sheriff's office to record a full statement before returning home.

At the close of the State's evidence, defendant offered no evidence in response to the State's case. Defendant also stipulated to being a convicted felon. During sentencing, the trial court consolidated the convictions into four judgments and sentenced defendant to two concurrent prison terms of 386 to 524 months for first-degree rape and first-degree sexual offense, and additional concurrent terms of 25 to 39 months for possession of a firearm by a felon and 10 to 21 months for crime against nature. Defendant appeals.

---

On appeal, defendant raises three arguments challenging the use of the term "victim" to refer to Crystal at various points during the trial: (I) whether the trial court committed plain error in allowing eight of the State's witnesses to refer to Crystal as the victim, (II) whether he received ineffective assistance of counsel ("IAC") in violation of the Sixth Amendment because his counsel failed to object when the State's witnesses referred to Crystal as a victim, and (III) whether the trial court committed plain error by using the term "the victim" to refer to Crystal in its charge to the jury. We find each of these arguments meritless.

## I. *Witness Testimony*

Defendant faults the trial court for allowing multiple witnesses to refer to Crystal as the victim during their testimony. In addition to five of the sheriff's deputies involved in the investigation, an emergency room nurse who assisted in

administering the sexual assault kit to Crystal on 24 November 2015 and two forensic analysts with the North Carolina State Crime Laboratory each used the term "victim" on at least one occasion when referring to Crystal. By characterizing Crystal as a victim, defendant argues, these witnesses effectively vouched for the truth of her accusations against him. Moreover, because five of the witnesses were law enforcement officers and four testified as experts, defendant contends their vouching for Crystal's story was particularly likely to have influenced the jury.

Defendant concedes he did not object to the challenged testimony but claims the trial court's failure to act *ex mero motu* to strike all testimony referring to Crystal as a victim amounts to plain error under N.C.R. App. P. 10(a)(4). We disagree.

"In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. 10(a)(1); *see also* N.C.G.S. § 8C-1, Rule 103(a)(1) (2019) (requiring "timely objection" to preserve error). However, "[i]n criminal cases, an issue that was not preserved by objection . . . may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4).

To establish plain error,

> a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations, quotation marks, and brackets omitted).

Defendant cannot show plain error. This Court has rejected the premise that the use of the term "victim" by prosecution witnesses represents a "reinforcing the complainant's credibility at the expense of defendant." *State v. Jackson*, 202 N.C. App. 564, 568–69, 688 S.E.2d 766, 769 (2010). Here, as in *Jackson*, the strength of the State's evidence against defendant—which included officers' real-time communication with and pursuit of defendant and Crystal, injuries to Crystal consistent with her account of her abduction, immediate seizure of incriminating evidence from multiple locations, and contemporaneous statements from Crystal, Ms. Kimes, and defendant—outweighed any potential subliminal effect of the witnesses' occasional references to Crystal as the victim. *Id.* at 569, 688 S.E.2d at 769.

In his brief to this Court, defendant cites several cases in which an expert witness or police officer was held to have impermissibly vouched for a complainant's credibility or opined on the defendant's guilt. *See, e.g.*, *State v. Carrillo*, 164 N.C.

App. 204, 209-10, 595 S.E.2d 219, 223 (2004) (ruling officer's response on cross-examination, "I think your client knew what was in that package[,]" amounted to an inadmissible opinion of the defendant's guilt); *State v. O'Connor*, 150 N.C. App. 710, 712, 564 S.E.2d 296, 297 (2002) (deeming it "error to admit into evidence that portion of Dr. Brown's written report wherein she states J.M.'s disclosure to her that [the] Defendant 'sodomized and performed oral sex on him . . . was *credible*' " (ellipsis in original; emphasis added)); *State v. Aguallo*, 318 N.C. 590, 599, 350 S.E.2d 76, 81 (1986) (holding pediatrician's testimony, "I think she's believable[,]" was an impermissible "expert's opinion as to the credibility of the victim"). However, none of these cases rests on a witness's mere reference to the complainant as a victim. They, therefore, provide no support for defendant's claim.

The three expert witnesses, who used the term "victim" to refer to Crystal, testified as forensics analysts in the fields of fingerprint identification, hair examination, and DNA and body fluid identification—not as experts in sexual assault or the psychology of sexual assault victims.[4] The witnesses did not purport to have

---

[4] These forensics experts testified that a latent print from defendant's right middle finger was found on the exterior of Ms. Kimes's car above the rear driver's-side door; a vaginal swab from Crystal's sexual assault kit "revealed the presence of sperm;" and Crystal's pubic hair combing contained a hair "microscopically consistent" with samples obtained from defendant. A swab taken by Moore County sheriff's deputies from the .380 caliber handgun seized from Ms. Kimes's bedroom closet on 24 November 2015 disclosed a DNA mixture from a least three individual contributors. Subsequent analysis excluded Ms. Kimes as a potential contributor but could not exclude Crystal or defendant. An additional swab of the gun's front barrel contained a DNA mixture from three contributors of which defendant and Ms. Kimes were excluded but Crystal could not be excluded as the potential major contributor.

interacted with Crystal or have any familiarity with her account of the events of 24 November 2015. We find no likelihood that the jury somehow misconstrued their testimony as vouching for Crystal's credibility.

Defendant further suggests that Nurse Hobbs, who assisted in administering the sexual assault kit to Crystal, was also "implicitly qualified" as an expert witness "by the trial court's allowance of her opinion testimony." A review of the transcript, however, shows Nurse Hobbs did not offer any opinions but merely recounted the step-by-step evidence-collection process she used with the sexual assault kit. When asked specifically about her interaction with Crystal on 24 November 2015, Nurse Hobbs responded as follows:

> A. I don't remember much. What I do remember is I was not her primary nurse. I was asked to do the sexual assault kit. So I was along with her, along with another nurse doing the kit.
>
> Q. Okay. If you remember, Ms. Hobbs, how was Ms. Womble's kind of demeanor while she was with you, if you recall or if you remember from that day?
>
> A. I don't remember much.

Finally, although Nurse Hobbs did use the term "victim" in reference to Crystal, she made clear she was reading from the sexual assault kit's instruction sheet. Defendant has not shown any prejudice resulting from her testimony.

## II. *Ineffective Assistance of Counsel*

As an alternative to his claim of plain error, defendant contends his trial counsel's failure to object to the use of the term "victim" by the State's witnesses violated his constitutional right to effective assistance of counsel. To succeed on an IAC claim, defendant "must show that counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693, 698 (1984); *State v. Braswell*, 312 N.C. 553, 562–63, 324 S.E.2d 241, 248 (1985) (adopting the *Strickland* standard for IAC claims under N.C. Const. art. 1, §§ 19, 23). "[I]f a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *Braswell*, 312 N.C. at 563, 324 S.E.2d at 249.

For the reasons discussed above, we find no reasonable probability that defendant would have obtained a more favorable outcome at trial had his counsel objected on each occasion when a witness used the term "victim" to refer to Crystal.[5] *See Jackson*, 202 N.C. App. at 569, 688 S.E.2d at 769 (citing *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693). Accordingly, defendant's alternative argument is overruled.

III. *Jury instructions*

---

[5] As defendant notes in his brief, counsel raised two such objections, both of which were sustained.

- 16 -

Defendant also argues that the trial court committed error, or plain error, in repeatedly referring to Crystal as the "victim" during its charge to the jury. He acknowledges having failed to object to the trial court's jury instructions. Still, he contends that the court's characterization of Crystal as a victim constitutes an impermissible "expression of a judicial opinion" in violation of N.C.G.S. §§ 15A-1222, -1232 (2019). Where the trial court violates a statutory mandate, defendant contends, no objection is required to preserve the issue for appellate review. *See State v. Ashe*, 314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985).

Our Supreme Court has consistently rejected a defendants' attempts to couch the trial court's use of the term "victim" in its jury instructions as an improper expression of judicial opinion in violation of N.C.G.S. §§ 15A-1222 and 15A-1232. *See State v. Gaines*, 345 N.C. 647, 675, 483 S.E.2d 396, 413 (1997); *State v. McCarroll*, 336 N.C. 559, 565–66, 445 S.E.2d 18, 22 (1994); *State v. Hill*, 331 N.C. 387, 411, 417 S.E.2d 765, 777 (1992) ("The use of the word 'victim' in the jury charge was not improper. By using the term 'victim,' the trial court was not intimating that the defendant committed the crime." (citations omitted)). We are not persuaded by defendant's attempt to do so here.

Likewise, our Supreme Court has rejected the argument that the trial court's use of the term "victim" in its charge to the jury amounts to plain error under N.C.R. App. P. 10(a)(4). *See McCarroll*, 336 N.C. at 565–66, 445 S.E.2d at 22 ("We cannot

hold that the reference to the prosecuting witness as the victim was an error so basic and lacking in its elements that justice could not have been done.").  Indeed, in *State v. Walston*, 367 N.C. 721, 766 S.E.2d 312 (2014), the Court found no error in the trial court's use of the term "victim" even though the defendant "objected to the trial court's use of the pattern jury instructions and requested that the court substitute the phrase 'alleged victim' for 'victim' when giving the jury charge."[6]  *Id.* at 728, 732, 766 S.E.2d at 317, 319; *see also Jackson*, 202 N.C. App. at 569, 688 S.E.2d at 769 ("The trial court tracked the language of the pattern jury instruction for statutory rape nearly word-for-word, and the instruction uses the term 'victim' ten times. . . .  The trial court did not err, let alone commit plain error." (citations omitted)).

Here, defendant failed to raise a timely objection to the jury charge, limiting our review to plain error.  As discussed at the charge conference, the trial court adhered to the language of the pattern jury instructions for each of the charged offenses involving Crystal.[7]  *See* N.C.P.I.—Crim 201.25 (Mar. 2005) (kidnapping), 207.10 (Jan. 2002) (rape), 207.40 (May 2001) (sexual offense), 208.50 (Mar. 2002) (assault with a deadly weapon), 208.70 (June 2011) (assault on a female), 208.85 (Apr.

---

[6] The *Walston* Court did suggest that "when the State offers no physical evidence of injury to the complaining witnesses and no corroborating eyewitness testimony, the best practice would be for the trial court to modify the pattern jury instructions at defendant's request to use the phrase 'alleged victim' or 'prosecuting witness' instead of 'victim.' " *Walston*, 367 N.C. at 732, 766 S.E.2d at 319.  Here, however, Crystal had physical injuries indicating she was the victim of at least some type of assault.

[7] The trial court substituted the term "alleged victim" for the pattern instruction's term "victim" when instructing the jury on first degree sexual offense and assault on a female.

2002) (assault by pointing gun), 226.10A (June 2006) (crime against nature), 235.18 (Feb. 2000) (communicating threats). The court also instructed the jury that defendant was "presumed to be innocent" and that it was the State's burden of proving his guilt beyond a reasonable doubt. It reminded jurors that they were "the sole judges of the credibility of each witness and the weight to be given to testimony of each witness." Finally, the court admonished the jury "not [to] infer from anything I have done or said that the evidence is to be believed or disbelieved, that a fact has been proved or what your findings ought to be." Accordingly, we find no plain error in the court's jury charge. *See Walston*, 367 N.C. at 732, 766 S.E.2d at 319; *see also Jackson*, 202 N.C. App. at 569, 688 S.E.2d at 769.

To the extent defendant separately asserts a violation of his right to due process or other constitutional injury arising from the jury charge, we conclude his claim is not properly before this Court. "It is well settled that constitutional issues which are not raised and ruled upon in the trial court will not be reviewed for the first time on appeal." *State v. McClain*, 169 N.C. App. 657, 666, 610 S.E.2d 783, 789 (2005).

### *Conclusion*

The trial court did not commit plain error in admitting witness testimony or charging the jury. With regard to defendant's ineffective assistance of counsel claim, we find no error.

NO ERROR IN PART; NO PLAIN ERROR IN PART.

Judges INMAN and HAMPSON concur.