IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA19-68

 Filed: 7 July 2020

Moore County, Nos. 15 CRS 1841, 53404-07

STATE OF NORTH CAROLINA

 v.

EDWARD LAMONT WOMBLE

 Appeal from judgments entered 6 July 2018 by Judge James M. Webb in Moore

County Superior Court. Heard in the Court of Appeals 9 June 2020.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Michael
 T. Wood, for the State.

 Mark Montgomery for defendant-appellant.

 BRYANT, Judge.

 On 6 July 2018, defendant Edward Lamont Womble was found guilty of first-

degree rape, first-degree sexual offense, crime against nature, assault on a female,

assault with a deadly weapon, assault by pointing a gun, possession of a firearm by a

felon, and willfully communicating threats.1

 _________________________________________________________

 On 6 July 2018, defendant Edward Lamont Womble was found guilty of first-

degree rape, first-degree sexual offense, crime against nature, assault on a female,

 1 The jury acquitted defendant of first-degree kidnapping.
 STATE V. WOMBLE

 Opinion of the Court

assault with a deadly weapon, assault by pointing a gun, possession of a firearm by a

felon, and willfully communicating threats.2

 Factual and Procedural History

 The State’s evidence at trial tended to show the following: defendant and

Crystal were married on 25 August 2011. Together, they have one child, and Crystal

had five other minor children. Defendant grew abusive toward Crystal during their

marriage, and they separated in March 2013. After Crystal filed for divorce in March

2015 and before the divorce was finalized in January 2016, she and defendant began

communicating about their son and saw each other regularly.

 In November 2015, Crystal and her minor children lived in her mother’s house

outside of Carthage in Moore County. Defendant stayed at least part-time in the

home of his girlfriend, Shantell Kimes, in Ramseur.

 Ms. Kimes purchased two Cobra .380 caliber, semi-automatic pistols for

defendant in 2015. The first gun, which Ms. Kimes purchased on 30 June 2015, was

seized by law enforcement on 5 November 2015. The second gun was purchased by

Ms. Kimes on 16 November 2015 and seized on 24 November 2015. At the time of

defendant’s trial, Ms. Kimes had pled guilty to federal gun charges stemming from

these two straw purchases and was awaiting sentencing. She had hoped to obtain a

lesser sentence as a result of her testimony against defendant.

 2 The jury acquitted defendant of first-degree kidnapping.

 -2-
 STATE V. WOMBLE

 Opinion of the Court

 A. The 5 November 2015 Incident

 On 5 November 2015, defendant and Crystal had an argument about their

relationship while parked in her car in a church parking lot near her mother’s house.

When Crystal told defendant she would not reconcile with him, he slapped her and

said, “You need to get away from me before I kill you.” Crystal exited the car.

Defendant took her place in the driver’s seat and said, “You think I’m playing with

you? . . . I’ll shoot you and your kids[,]” before driving off in her car.

 Crystal called 911 and reported that her “husband was going to get a gun to

come back and shoot [her] and [her] kids.” While still on the phone, Crystal heard

her car returning3 and hid behind a shed. Defendant drove past Crystal to her

mother’s house. Defendant asked Crystal’s mother where Crystal was before

proceeding onto McCrimmon Road toward State Highway 15-501. Crystal remained

on the phone with 911 until law enforcement arrived at her location.

 Responding to the 911 call, Detective Rodriguez and Captain Medlin of the

Moore County Sheriff’s Office stopped defendant’s vehicle at the intersection of

McCrimmon Road and Highway 15-501. Corporal Cameron also responded to the

scene and observed Detective Rodriguez speaking to defendant beside a white Honda

Civic. Defendant “stated that it wasn’t his car and he stated it was registered to his

wife, Crystal . . . .” After obtaining Crystal’s consent to search the car, officers found

 3 Crystal testified her car was “loud” because it lacked a muffler.

 -3-
 STATE V. WOMBLE

 Opinion of the Court

“what appeared to be a half[-]burnt marijuana cigarette . . . in the small pocket of the

[front] door.” Corporal Cameron also found defendant’s driver’s license and “several

small handgun caliber bullets . . . in the glove box,” and a black Cobra .380 caliber,

semi-automatic handgun under the passenger seat. Defendant was charged with

multiple offenses related to the items seized during the traffic stop but was not taken

into custody.

 Captain Medlin drove to Barbers Park Drive to check on Crystal, who said “she

had gotten into an argument with [defendant] over custody of a child and that the

argument had escalated . . . to the point where he said he was going to leave to go get

a gun and come back and shoot her and the kids.” Captain Medlin advised Crystal

to go to the magistrate’s office to “swear out a warrant [against defendant] for

communicating threats[.]” Crystal did so that same day and received an ex parte

protection order from the trial court.

 B. The 24 November 2015 Incident

 Defendant spent the night of 23 November 2015 at Ms. Kimes’s home in

Ramseur and set an alarm clock for 4:30 a.m. Ms. Kimes asked why he was setting

the alarm, and he replied, “So I can kill Crystal.” When the alarm clock sounded on

the morning of 24 November 2015, defendant got up, took a shower, and again told

Ms. Kimes, “I’m going to kill Crystal.” Defendant retrieved his Cobra .380 caliber, a

 -4-
 STATE V. WOMBLE

 Opinion of the Court

semi-automatic pistol, from Ms. Kimes’s closet, and left in Ms. Kimes’s white Nissan

Altima.

 Crystal drove her son to the bus stop at 5:30 a.m. on 24 November 2015. When

the bus arrived, her son exited her car and boarded the bus. While Crystal was

adjusting her car’s heater and “not paying attention,” defendant opened the car door,

sat down in the passenger seat with a gun in his hand, and said, “You wasn’t

expecting this, was [sic] you?” Defendant told Crystal to drive to the home of James

A. Gilmore, who lived on a dirt road near her mother’s house. When they arrived in

Mr. Gilmore’s yard, defendant ordered Crystal out of her car and into the Altima.

Crystal refused, and defendant struck her with his gun––hitting her on the top of her

head and her right eyebrow. Crystal fell to the ground and dropped her phone in Mr.

Gilmore’s yard before getting into the Altima, her head “pouring” blood.

 On the morning of 24 November 2015, Mr. Gilmore saw Crystal’s car and cell

phone in his yard, and found the circumstance to be “kind of strange” because Crystal

had never parked her car at his house. He picked up the phone and walked to

Crystal’s mother’s house. When Mr. Gilmore handed the phone to Crystal’s mother

and told her Crystal’s car was in his yard, she asked Crystal’s daughter to call 911.

Lieutenant Williams and other members of the Moore County Sheriff’s Office

responded to the call and began an investigation into Crystal’s disappearance.

 -5-
 STATE V. WOMBLE

 Opinion of the Court

 Defendant drove Crystal to a boat landing on a dirt road near Carbonton,

saying he was “going to kill [her], put [her] body in a ditch so [her children] can’t find

[her].” Defendant parked at the boat landing and asked Crystal for sex. Because

defendant was holding her at gunpoint, Crystal engaged in oral and vaginal

intercourse with him. After having sex with Crystal, he began to ask her, “Why did

I do this? What am I going to do now? . . . I can’t take you back.”

 Defendant returned with Crystal to Ms. Kimes’s house and parked in the

driveway. He tried to stab Crystal with a syringe full of insulin, which he used to

treat his diabetes. When the needle broke off of the syringe, defendant drove away

from Ms. Kimes’s house and parked on a side street where he continued to fight with

Crystal, biting her on the right hand.

 After speaking to Crystal’s mother, Lieutenant Williams called Detective

Rodriguez, told him Crystal was missing, and asked him to go to defendant’s mother’s

house and try to locate defendant. Detective Rodriguez went to defendant’s mother’s

residence and asked her to “please contact [defendant] to see if he knew where Crystal

was.” Defendant’s mother spoke to defendant on his cell phone and then gave

Detective Rodriguez his phone number. Detective Rodriguez immediately called

defendant and asked if he had seen Crystal. Defendant said he had not seen Crystal

and did not know where she was. Approximately fifteen minutes later, Crystal

phoned Detective Rodriguez and said she was fine and was visiting friends in

 -6-
 STATE V. WOMBLE

 Opinion of the Court

Asheboro. Detective Rodriguez asked Crystal to call Lieutenant Williams and verify

she was okay.

 Defendant next drove with Crystal to mechanic Joe Brady’s garage in Siler

City, where he asked Mr. Brady if he could take a “look at the Mazda out back” behind

the garage. Defendant instead took a cup containing the broken syringe and the

bloody tissues Crystal had used on her head wounds and deposited the cup in a “burn

barrel” Mr. Brady kept on the property to burn trash. Mr. Brady remained in the

garage but saw defendant “walk[] out back” in the direction of the Mazda.

 As Crystal pleaded with defendant to take her home, he instead drove to the

home of another friend in Siler City, Richard McSwain, who noticed a mark on

Crystal’s forehead. Defendant asked Mr. McSwain to “hold” defendant’s gun, but he

refused.

 While at Mr. McSwain’s house, Crystal borrowed a phone to call Lieutenant

Williams. With defendant listening in on the call, Crystal told Lieutenant Williams

she was visiting friends in Asheboro. Lieutenant Williams asked Crystal to go to the

Asheboro Police Department to confirm she was safe. After the call, Crystal’s family

told Lieutenant Williams that Crystal “doesn’t know anybody in Asheboro.”

 Lieutenant Williams contacted Detective Rodriguez and instructed him to

return to defendant’s mother’s residence and serve defendant with the outstanding

arrest warrant from the 5 November 2015 incident. Detective Rodriguez called

 -7-
 STATE V. WOMBLE

 Opinion of the Court

defendant, said he needed to take a statement from him, and asked to meet him at

his mother’s house. Defendant agreed and said he was approximately 45 minutes

from his mother’s house.

 Defendant drove back to Ramseur and stopped at a BP gas station on State

Highway 64. Defendant left Crystal at the BP station, saying he had to attend court

in Carthage and would come back for her. Crystal entered the store and went into

the restroom to tend to her still-bleeding head. When she emerged from the restroom,

she asked the store’s cashier if she could use the phone.

 Diane Helms was working at the BP station when Crystal came inside with a

wound on her forehead and asked to use the restroom. When Crystal emerged from

the restroom, “[s]he was just kind of walking around, looking out the window” toward

the gas pumps. Ms. Helms asked her what had happened. Crystal appeared “nervous

and upset” and did not answer. A few minutes later, Crystal asked to use the phone

and told Ms. Helms, “He has a gun.”

 After leaving Crystal at the BP station, defendant drove back to Ms. Kimes’s

residence and placed his .380 caliber handgun back in her bedroom closet. He then

told Ms. Kimes, “Let’s go, [be]cause the police is at my mama[’s] house.” As Ms. Kimes

drove defendant back to the BP station to get gas, she noticed “a lot of blood in” her

car.

 -8-
 STATE V. WOMBLE

 Opinion of the Court

 Meanwhile, Crystal tried to call Detective Rodriguez, but he did not answer.

She tried to call 911 to reach the Carthage police but hung up the phone when

defendant arrived back at the BP station, accompanied by Ms. Kimes. Defendant put

gas in Ms. Kimes’s car and walked into the store to pay and check on Crystal, who

promised to wait for him to come back for her. After defendant left the store and

drove off with Ms. Kimes, Crystal called Lieutenant Williams and revealed what had

happened to her. Lieutenant Williams told Crystal to wait for her in the store.

 Defendant and Ms. Kimes drove from the BP station to his mother’s house in

Carthage, where they were met by sheriff’s deputies. Detective Rodriguez arrested

defendant on the outstanding warrant for the domestic violence protection order, and

Deputy Godfrey transported defendant to the sheriff’s office. Ms. Kimes also drove

to the sheriff’s office, where she was interviewed and consented to a search of her car

and her bedroom closet where defendant had placed the handgun.

 Captain Hart and Detective Fogle transported Ms. Kimes from the sheriff’s

office to her residence in Ramseur to retrieve the weapon. After obtaining the loaded

.380 caliber pistol from a “white plastic container on top of the master bedroom

closet,” they drove Ms. Kimes back to the sheriff’s office. Lieutenant Holders

conducted a recorded interview with Ms. Kimes, which was published to the jury.

 Defendant waived his Miranda rights and was interviewed by Detective

Rodriguez at the sheriff’s office. Defendant initially claimed he had spent the day at

 -9-
 STATE V. WOMBLE

 Opinion of the Court

Ms. Kimes’s residence. Confronted with the information Lieutenant Holders

obtained from Ms. Kimes, however, defendant “started crying” and said, “I’m done.

I’m done.” Defendant “admitted to lying to [Detective Rodriguez] and that. . . he had

been with Ms. Crystal Womble.” A copy of the audio-video recording of defendant’s

interview was admitted into evidence and published to the jury.

 Investigator Lowery drove with Lieutenant Williams to meet Crystal at the BP

station in Ramseur. He observed a laceration on Crystal’s face and saw that she was

upset and crying. On the way to the hospital, Crystal told the deputies about her

abduction by defendant and led them to the series of locations he had taken her,

including Mr. Brady’s garage and the boat landing. Lieutenant Williams retrieved

the cup containing the syringe and bloody tissues from the burn barrel on Mr. Brady’s

property. After visiting the boat landing, the deputies drove Crystal to FirstHealth

Moore Regional Hospital.

 While awaiting medical attention, Crystal gave a partial statement about the

day’s events to Investigator Lowery. Hospital personnel used five stitches to close

the wound on Crystal’s forehead; they also x-rayed her right hand and administered

a sexual assault kit evidence collection. After being released from the hospital,

Crystal was taken to the sheriff’s office to record a full statement before returning

home.

 - 10 -
 STATE V. WOMBLE

 Opinion of the Court

 At the close of the State’s evidence, defendant offered no evidence in response

to the State’s case. Defendant also stipulated to being a convicted felon. During

sentencing, the trial court consolidated the convictions into four judgments and

sentenced defendant to two concurrent prison terms of 386 to 524 months for first-

degree rape and first-degree sexual offense, and additional concurrent terms of 25 to

39 months for possession of a firearm by a felon and 10 to 21 months for crime against

nature. Defendant appeals.

 _________________________________________________________

 On appeal, defendant raises three arguments challenging the use of the term

“victim” to refer to Crystal at various points during the trial: (I) whether the trial

court committed plain error in allowing eight of the State’s witnesses to refer to

Crystal as the victim, (II) whether he received ineffective assistance of counsel (“IAC”)

in violation of the Sixth Amendment because his counsel failed to object when the

State’s witnesses referred to Crystal as a victim, and (III) whether the trial court

committed plain error by using the term “the victim” to refer to Crystal in its charge

to the jury. We find each of these arguments meritless.

 I. Witness Testimony

 Defendant faults the trial court for allowing multiple witnesses to refer to

Crystal as the victim during their testimony. In addition to five of the sheriff’s

deputies involved in the investigation, an emergency room nurse who assisted in

 - 11 -
 STATE V. WOMBLE

 Opinion of the Court

administering the sexual assault kit to Crystal on 24 November 2015 and two forensic

analysts with the North Carolina State Crime Laboratory each used the term “victim”

on at least one occasion when referring to Crystal. By characterizing Crystal as a

victim, defendant argues, these witnesses effectively vouched for the truth of her

accusations against him. Moreover, because five of the witnesses were law

enforcement officers and four testified as experts, defendant contends their vouching

for Crystal’s story was particularly likely to have influenced the jury.

 Defendant concedes he did not object to the challenged testimony but claims

the trial court’s failure to act ex mero motu to strike all testimony referring to Crystal

as a victim amounts to plain error under N.C.R. App. P. 10(a)(4). We disagree.

 “In order to preserve an issue for appellate review, a party must have

presented to the trial court a timely request, objection, or motion, stating the specific

grounds for the ruling the party desired the court to make if the specific grounds were

not apparent from the context.” N.C.R. App. P. 10(a)(1); see also N.C.G.S. § 8C-1,

Rule 103(a)(1) (2019) (requiring “timely objection” to preserve error). However, “[i]n

criminal cases, an issue that was not preserved by objection . . . may be made the

basis of an issue presented on appeal when the judicial action questioned is

specifically and distinctly contended to amount to plain error.” N.C.R. App. P.

10(a)(4).

 To establish plain error,

 - 12 -
 STATE V. WOMBLE

 Opinion of the Court

 a defendant must demonstrate that a fundamental error
 occurred at trial. To show that an error was fundamental,
 a defendant must establish prejudice—that, after
 examination of the entire record, the error had a probable
 impact on the jury’s finding that the defendant was guilty.
 Moreover, because plain error is to be applied cautiously
 and only in the exceptional case, the error will often be one
 that seriously affects the fairness, integrity or public
 reputation of judicial proceedings.

State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations,

quotation marks, and brackets omitted).

 Defendant cannot show plain error. This Court has rejected the premise that

the use of the term “victim” by prosecution witnesses represents a “reinforcing the

complainant’s credibility at the expense of defendant.” State v. Jackson, 202 N.C.

App. 564, 568–69, 688 S.E.2d 766, 769 (2010). Here, as in Jackson, the strength of

the State’s evidence against defendant—which included officers’ real-time

communication with and pursuit of defendant and Crystal, injuries to Crystal

consistent with her account of her abduction, immediate seizure of incriminating

evidence from multiple locations, and contemporaneous statements from Crystal, Ms.

Kimes, and defendant—outweighed any potential subliminal effect of the witnesses’

occasional references to Crystal as the victim. Id. at 569, 688 S.E.2d at 769.

 In his brief to this Court, defendant cites several cases in which an expert

witness or police officer was held to have impermissibly vouched for a complainant’s

credibility or opined on the defendant’s guilt. See, e.g., State v. Carrillo, 164 N.C.

 - 13 -
 STATE V. WOMBLE

 Opinion of the Court

App. 204, 209-10, 595 S.E.2d 219, 223 (2004) (ruling officer’s response on cross-

examination, “I think your client knew what was in that package[,]” amounted to an

inadmissible opinion of the defendant’s guilt); State v. O’Connor, 150 N.C. App. 710,

712, 564 S.E.2d 296, 297 (2002) (deeming it “error to admit into evidence that portion

of Dr. Brown’s written report wherein she states J.M.’s disclosure to her that [the]

Defendant ‘sodomized and performed oral sex on him . . . was credible’ ” (ellipsis in

original; emphasis added)); State v. Aguallo, 318 N.C. 590, 599, 350 S.E.2d 76, 81

(1986) (holding pediatrician’s testimony, “I think she’s believable[,]” was an

impermissible “expert’s opinion as to the credibility of the victim”). However, none of

these cases rests on a witness’s mere reference to the complainant as a victim. They,

therefore, provide no support for defendant’s claim.

 The three expert witnesses, who used the term “victim” to refer to Crystal,

testified as forensics analysts in the fields of fingerprint identification, hair

examination, and DNA and body fluid identification—not as experts in sexual assault

or the psychology of sexual assault victims.4 The witnesses did not purport to have

 4 These forensics experts testified that a latent print from defendant’s right middle finger was
found on the exterior of Ms. Kimes’s car above the rear driver’s-side door; a vaginal swab from Crystal’s
sexual assault kit “revealed the presence of sperm;” and Crystal’s pubic hair combing contained a hair
“microscopically consistent” with samples obtained from defendant. A swab taken by Moore County
sheriff’s deputies from the .380 caliber handgun seized from Ms. Kimes’s bedroom closet on 24
November 2015 disclosed a DNA mixture from a least three individual contributors. Subsequent
analysis excluded Ms. Kimes as a potential contributor but could not exclude Crystal or defendant. An
additional swab of the gun’s front barrel contained a DNA mixture from three contributors of which
defendant and Ms. Kimes were excluded but Crystal could not be excluded as the potential major
contributor.

 - 14 -
 STATE V. WOMBLE

 Opinion of the Court

interacted with Crystal or have any familiarity with her account of the events of 24

November 2015. We find no likelihood that the jury somehow misconstrued their

testimony as vouching for Crystal’s credibility.

 Defendant further suggests that Nurse Hobbs, who assisted in administering

the sexual assault kit to Crystal, was also “implicitly qualified” as an expert witness

“by the trial court’s allowance of her opinion testimony.” A review of the transcript,

however, shows Nurse Hobbs did not offer any opinions but merely recounted the

step-by-step evidence-collection process she used with the sexual assault kit. When

asked specifically about her interaction with Crystal on 24 November 2015, Nurse

Hobbs responded as follows:

 A. I don’t remember much. What I do remember is I was
 not her primary nurse. I was asked to do the sexual assault
 kit. So I was along with her, along with another nurse
 doing the kit.

 Q. Okay. If you remember, Ms. Hobbs, how was Ms.
 Womble’s kind of demeanor while she was with you, if you
 recall or if you remember from that day?

 A. I don’t remember much.

Finally, although Nurse Hobbs did use the term “victim” in reference to Crystal, she

made clear she was reading from the sexual assault kit’s instruction sheet.

Defendant has not shown any prejudice resulting from her testimony.

 II. Ineffective Assistance of Counsel

 - 15 -
 STATE V. WOMBLE

 Opinion of the Court

 As an alternative to his claim of plain error, defendant contends his trial

counsel’s failure to object to the use of the term “victim” by the State’s witnesses

violated his constitutional right to effective assistance of counsel. To succeed on an

IAC claim, defendant “must show that counsel’s representation fell below an objective

standard of reasonableness” and “that there is a reasonable probability that, but for

counsel’s unprofessional errors, the result of the proceeding would have been

different.” Strickland v. Washington, 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693,

698 (1984); State v. Braswell, 312 N.C. 553, 562–63, 324 S.E.2d 241, 248 (1985)

(adopting the Strickland standard for IAC claims under N.C. Const. art. 1, §§ 19, 23).

“[I]f a reviewing court can determine at the outset that there is no reasonable

probability that in the absence of counsel’s alleged errors the result of the proceeding

would have been different, then the court need not determine whether counsel’s

performance was actually deficient.” Braswell, 312 N.C. at 563, 324 S.E.2d at 249.

 For the reasons discussed above, we find no reasonable probability that

defendant would have obtained a more favorable outcome at trial had his counsel

objected on each occasion when a witness used the term “victim” to refer to Crystal.5

See Jackson, 202 N.C. App. at 569, 688 S.E.2d at 769 (citing Strickland, 466 U.S. at

687, 80 L. Ed. 2d at 693). Accordingly, defendant’s alternative argument is overruled.

 III. Jury instructions

 5 As defendant notes in his brief, counsel raised two such objections, both of which were
sustained.

 - 16 -
 STATE V. WOMBLE

 Opinion of the Court

 Defendant also argues that the trial court committed error, or plain error, in

repeatedly referring to Crystal as the “victim” during its charge to the jury. He

acknowledges having failed to object to the trial court’s jury instructions. Still, he

contends that the court’s characterization of Crystal as a victim constitutes an

impermissible “expression of a judicial opinion” in violation of N.C.G.S. §§ 15A-1222,

-1232 (2019). Where the trial court violates a statutory mandate, defendant contends,

no objection is required to preserve the issue for appellate review. See State v. Ashe,

314 N.C. 28, 39, 331 S.E.2d 652, 659 (1985).

 Our Supreme Court has consistently rejected a defendants’ attempts to couch

the trial court’s use of the term “victim” in its jury instructions as an improper

expression of judicial opinion in violation of N.C.G.S. §§ 15A-1222 and 15A-1232. See

State v. Gaines, 345 N.C. 647, 675, 483 S.E.2d 396, 413 (1997); State v. McCarroll,

336 N.C. 559, 565–66, 445 S.E.2d 18, 22 (1994); State v. Hill, 331 N.C. 387, 411, 417

S.E.2d 765, 777 (1992) (“The use of the word ‘victim’ in the jury charge was not

improper. By using the term ‘victim,’ the trial court was not intimating that the

defendant committed the crime.” (citations omitted)). We are not persuaded by

defendant’s attempt to do so here.

 Likewise, our Supreme Court has rejected the argument that the trial court’s

use of the term “victim” in its charge to the jury amounts to plain error under N.C.R.

App. P. 10(a)(4). See McCarroll, 336 N.C. at 565–66, 445 S.E.2d at 22 (“We cannot

 - 17 -
 STATE V. WOMBLE

 Opinion of the Court

hold that the reference to the prosecuting witness as the victim was an error so basic

and lacking in its elements that justice could not have been done.”). Indeed, in State

v. Walston, 367 N.C. 721, 766 S.E.2d 312 (2014), the Court found no error in the trial

court’s use of the term “victim” even though the defendant “objected to the trial court’s

use of the pattern jury instructions and requested that the court substitute the phrase

‘alleged victim’ for ‘victim’ when giving the jury charge.”6 Id. at 728, 732, 766 S.E.2d

at 317, 319; see also Jackson, 202 N.C. App. at 569, 688 S.E.2d at 769 (“The trial court

tracked the language of the pattern jury instruction for statutory rape nearly word-

for-word, and the instruction uses the term ‘victim’ ten times. . . . The trial court did

not err, let alone commit plain error.” (citations omitted)).

 Here, defendant failed to raise a timely objection to the jury charge, limiting

our review to plain error. As discussed at the charge conference, the trial court

adhered to the language of the pattern jury instructions for each of the charged

offenses involving Crystal.7 See N.C.P.I.—Crim 201.25 (Mar. 2005) (kidnapping),

207.10 (Jan. 2002) (rape), 207.40 (May 2001) (sexual offense), 208.50 (Mar. 2002)

(assault with a deadly weapon), 208.70 (June 2011) (assault on a female), 208.85 (Apr.

 6 The Walston Court did suggest that “when the State offers no physical evidence of injury to
the complaining witnesses and no corroborating eyewitness testimony, the best practice would be for
the trial court to modify the pattern jury instructions at defendant’s request to use the phrase ‘alleged
victim’ or ‘prosecuting witness’ instead of ‘victim.’ ” Walston, 367 N.C. at 732, 766 S.E.2d at 319. Here,
however, Crystal had physical injuries indicating she was the victim of at least some type of assault.
 7 The trial court substituted the term “alleged victim” for the pattern instruction’s term

“victim” when instructing the jury on first degree sexual offense and assault on a female.

 - 18 -
 STATE V. WOMBLE

 Opinion of the Court

2002) (assault by pointing gun), 226.10A (June 2006) (crime against nature), 235.18

(Feb. 2000) (communicating threats). The court also instructed the jury that

defendant was “presumed to be innocent” and that it was the State’s burden of

proving his guilt beyond a reasonable doubt. It reminded jurors that they were “the

sole judges of the credibility of each witness and the weight to be given to testimony

of each witness.” Finally, the court admonished the jury “not [to] infer from anything

I have done or said that the evidence is to be believed or disbelieved, that a fact has

been proved or what your findings ought to be.” Accordingly, we find no plain error

in the court’s jury charge. See Walston, 367 N.C. at 732, 766 S.E.2d at 319; see also

Jackson, 202 N.C. App. at 569, 688 S.E.2d at 769.

 To the extent defendant separately asserts a violation of his right to due

process or other constitutional injury arising from the jury charge, we conclude his

claim is not properly before this Court. “It is well settled that constitutional issues

which are not raised and ruled upon in the trial court will not be reviewed for the

first time on appeal.” State v. McClain, 169 N.C. App. 657, 666, 610 S.E.2d 783, 789

(2005).

 Conclusion

 The trial court did not commit plain error in admitting witness testimony or

charging the jury. With regard to defendant’s ineffective assistance of counsel

claim, we find no error.

 - 19 -
 STATE V. WOMBLE

 Opinion of the Court

NO ERROR IN PART; NO PLAIN ERROR IN PART.

Judges INMAN and HAMPSON concur.

 - 20 -